# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7674 | **DATE** | 7/23/2004 |
| **CASE TITLE** | Do It Best Corporation vs. Passport Software, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The court grants in part and denies in part the motion of Do It Best and Thomas Burroughs to dismiss Counts IX, X, XI, and XII (Doc. No. 121-1). Specifically, the court dismisses PSI's Amended Count IX without prejudice to refiling, but denies the motion to dismiss with respect to Amended Counts X, XI, and XII. The court denies Thomas Burrough's motion to dismiss amended Count X (Doc. No. 152-1), and grants Do It Best's motion to dismiss amended Count IX (Doc. No. 153-1) without prejudice. Defendants are directed to file Answers to Amended Count X, XI, and XII within 21 days.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 5 number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | JUL 2 6 2004 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | 199 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 7/23/2004 | |
| ETV | courtroom deputy's initials | date mailed notice | |
| | | ETV mailing deputy initials | |

U.S. DISTRICT COURT

2004 JUL 23 AM 11: 57

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DOCKETED

JUL 2 6 2004

| | |
|---|---|
| DO IT BEST CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 01 C 7674 |
| | ) |
| PASSPORT SOFTWARE, INC. | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant, | ) |
| | ) |
| PASSPORT SOFTWARE, INC. | ) |
| | ) |
| Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DO IT BEST CORPORATION | ) |
| f/k/a HARDWARE WHOLESALERS, INC., | ) |
| and THOMAS BURROUGHS, | ) |
| | ) |
| Counter-Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Do it Best Corp. ("DIB") is a member-owned cooperative that distributes hardware, lumber and building materials to approximately 4,500 member retailers worldwide. In 1989, DIB entered into a software licensing agreement with Defendant Passport Software, Inc. ("PSI"), a licensed reseller of certain point-of-sale software owned by RealWorld Corp. ("RealWorld"). In September 2000, a dispute arose concerning DIB's alleged misuse of the software. On October 4, 2001, DIB filed this lawsuit seeking a declaration that it did not breach, and is not in default under, the 1989 agreement. PSI responded with several counterclaims, which it has amended several times, alleging breach of contract, trade secret misappropriation under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA"), civil conspiracy, copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, fraud, false designation of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and tortious interference with contract against DIB. PSI has

199

also named Thomas Burroughs ("Burroughs"), DIB's former corporate counsel, as an additional counter-defendant, charging Mr. Burroughs with contributory copyright infringement under the Copyright Act. PSI seeks permanent injunctive relief as well as damages in excess of $60 million against DIB and $1.8 million against Mr. Burroughs. DIB moves to dismiss PSI's fraud, false designation of origin, and tortious interference with contract counterclaims; Burroughs moves to dismiss PSI's contributory copyright infringement claim. For the reasons set forth below, DIB's motions are granted in part and denied in part, and Burroughs's motion is denied.

## FACTUAL BACKGROUND[1]

According to the Third Amended Counterclaims ("TAC"), on or about March 22, 1984, RealWorld and PSI entered into a Master Distributor Agreement ("MDA") granting PSI rights to reproduce, distribute, and enhance certain point-of-sale accounting software owned by RealWorld[2] (the "Accounting Suite"). (TAC ¶¶ 6-8.) This agreement was supplemented by a Master Value Added Distributor Agreement ("MVADA"), executed on July 1, 1988. (*Id.* ¶ 9.) On unspecified dates, PSI "developed many enhancements, modifications, and additions to the Accounting Suite" (the "Enhancements"). (*Id.* ¶ 10.) In addition, "PSI created some original software which it also delivered as Enhancements to the enhanced Accounting Suite . . . (the 'Original Works') which were integrated into the enhanced Real[]World software." (*Id.* ¶ 11.) PSI owns these

---

[1]     The facts presented in this section were compiled from Passport's Third Amended Counterclaims and Additional Claims, filed on October 30, 2003, as well as its amended fraud counterclaim against DIB and its amended contributory copyright infringement counterclaim against Thomas Burroughs, both of which were filed on February 9, 2004. For purposes of the latter two amended counterclaims, the court considers only the facts set forth in the February 2004 amended counts. *See Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998) ("It is well-established that an amended pleading supersedes the original pleading; facts not incorporated into the amended pleading are considered *functus officio*") (citations omitted).

[2]     The court notes that in 1999 RealWorld was acquired by Great Plains Software, Inc. ("Great Plains"), which in turn was acquired by Microsoft Corporation in 2000. *See, e.g.*, http://www.dchubbell.com/products.htm; http://www.microsoft.com/presspass/features/2000/Dec00/ 12-21gp.asp. For simplicity's sake, the court refers to RealWorld and its successors as "RealWorld."

Enhancements and Original Works.  (*Id.* ¶ 12.)

On an unspecified date, DIB[3] contacted RealWorld to inquire about purchasing the Accounting Suite for use in DIB's member stores.  (*Id.* ¶ 15.)  RealWorld referred DIB to PSI, as RealWorld knew PSI had developed Enhancements to the Accounting Suite that satisfied one of DIB's critical system requirements: that multiple terminals have simultaneous access to a single computer system.  (*Id.* ¶¶ 14-17.)  On January 19, 1989, DIB and PSI executed a Dealer License Agreement (the "License Agreement") for the Accounting Suite and certain Original Works and Enhancements created by PSI (the "Licensed Software").  (*Id.* ¶¶ 18, 20-21.)  PSI included copyright notices in all such Original Works and Enhancements.  (*Id.* ¶¶ 11, 19.)  The License Agreement permitted DIB to grant sublicenses to its member retailers within the continental United States, subject to certain conditions not spelled out in PSI's allegations.  (*Id.* ¶ 23.)  The agreement required DIB to pay a royalty fee to PSI for use of the Licensed Software (whether owned by PSI or RealWorld) based on modules[4] distributed to its members.  (*Id.* ¶ 22.)  Under the agreement, PSI and RealWorld retained all copyright, trade secret, patent, and other intellectual property rights in the Licensed Software.  (*Id.* ¶ 24.)  Beginning in 1993, PSI "authored computer programs and computer program Enhancements to RealWorld computer programs [(the "Programs")] consisting of original material and registered the [Programs] with the U.S. Copyright Office as unpublished textual works with an effective registration date of May 29, 2002."  (TAC Count XI ¶ 38.)[5]  On or

---

[3]    Until March 16, 1998, Do it Best was known as Hardware Wholesalers, Inc.  *See* http://www.doitbestcorp.com/history/.  For simplicity's sake, the court refers to Plaintiff as "Do it Best" throughout this opinion.

[4]    In the context of computing, the Oxford English Dictionary defines a module as "[a]ny of a number of distinct units from which a computer program may be built up, or into which a complex process or activity is analy[z]ed (usually for computer simulation), each of which is complete in itself but bears a definite relationship to the other units."  OXFORD ENGLISH DICTIONARY (2d ed. 1989).

[5]    PSI does not explain why it registered the Programs effective May 29, 2002, the (continued...)

about January 14, 1994, five days before the License Agreement was set to expire, DIB and PSI orally agreed to extend operation of the agreement until approximately January 2001. (*Id.* ¶¶ 25-26; Count IX (Amended) Fraud (hereinafter, "Am. Count IX") ¶¶ 19-20.)

At some point "[i]n or about 1990," Gary Zoller ("Zoller") of DIB[6] told John Miller ("Miller"), President of PSI, by telephone that a module relating to purchase order operations did not suit its business needs. (Am. Count IX ¶ 21.) During that conversation, Zoller claimed "that DIB would not use the purchase order module which PSI had delivered but would create its own purchase order module from scratch."[7] Years later, at some point "[i]n or about 1996," Zoller introduced Miller to Jennings at DIB's office and told Miller that Jennings was creating DIB's purchase order module. (*Id.* ¶ 23.) On unspecified dates, PSI alleges, Jim Jennings ("Jennings") and Scott Everson ("Everson"), programmers for DIB, wrote DIB's purchase order module using source code that they knew had been copied from PSI original source code and RealWorld source code for which PSI was entitled to royalties. (Am. Count IX ¶¶ 24-25, 27.)[8]

PSI claims that "DIB knew" that Zoller's statements that DIB had created its purchase order on its own was not true. (*Id.* ¶ 26.) Instead, "[a]t the time Zoller made the representation to Miller

---

[5](...continued)
significance of these Programs, or what prompted PSI to begin creating the Programs in 1993 (three years after Zoller allegedly told Miller that DIB needed to make its own adjustments to the software). Although PSI does not indicate how the Programs differ from the Enhancements described in paragraph 10 of the TAC and in PSI's trade secret misappropriation counterclaim, the court presumes the Programs constitute a subset of those Enhancements.

[6]     None of PSI's counterclaims identifies Mr. Zoller's position.

[7]     Although paragraph 22 does not indicate the date on which Zoller made this statement, the court presumes he uttered this alleged statement on the same date as the statement described in paragraph 21.

[8]     At least one commentator suggests that the circumstances alleged here are not unusual. *See* Jason Krause, *Code Name: Trouble*, ABA Journal (July 9, 2004) (noting that, according to a recent survey, "75 percent of all coders use blocks of computer code they have appropriated from other software"), *at* http://www.abanet.org/journal/ereport/jy9code.html.

that DIB was creating its own purchase order module, DIB by its agents Jennings and [Everson] knew DIB had or intended to incorporate source code which belonged to PSI in the various modules." (*Id.* ¶ 28.) PSI also contends that Zoller's statement that DIB's purchase order module was original "was made with the intent that PSI rely on the statement, be deterred from discovering that DIB had included source code in its purchase order module which was not original and had been delivered so that PSI would not invoice DIB or its members for the use of the PSI and Real[]World source code contained in DIB's purchase order module." (*Id.* ¶ 29.) PSI alleges that it relied on Zoller's statements and did not invoice DIB or its members for the use of PSI or Real World source code. (*Id.* ¶ 30.)

PSI does not indicate which of Zoller's alleged statements it is referring to in paragraphs 26, 28, 29 and 30. As the court reads the allegation in paragraph 28 involving "the representation to Miller that DIB was creating its own purchase order module," that paragraph refers to the allegation in paragraph 23 that in 1996 Zoller told Miller that Jennings was creating DIB's purchase order module. It is unclear whether the claims in paragraphs 26, 29, and 30 refer to Zoller's alleged 1990 statements, his asserted 1996 statement, or other unidentified remarks.

In or about August 2000, PSI alleges, DIB "began scheming to make, use, copy, and distribute [the Programs] for its own and its members['] use without abiding by the terms of the [License Agreement]." (Count X (Amended) Contributory Copyright Infringement (against Thomas Burroughs) (hereinafter, "Am. Count X") ¶ 11.) Also in or about August 2000, a committee of DIB employees (the "Committee"), including corporate counsel Thomas Burroughs, "took acts to determine ownership of the [Programs] and consulted with third parties who advised DIB that it would need to purchase or license PSI's rights to continue to use PSI software." (*Id.* ¶¶ 12-13.)[9]

---

[9]     PSI does not indicate whether ownership of the Programs was in doubt prior to August 2000 nor explain how PSI learned about consultations between the Committee and these unspecified third parties.

On or about August 31, 2000, Karla Wygant, a DIB employee,[10] wrote to the Committee that "I have run this software and modified programs with this information a million times and not noticed [the copyright notices]. This definitely throws another wrench in the works." (*Id.* ¶ 14.)[11]

As of 2000, the MVADA[12] between PSI and RealWorld, which had been modified several times, provided that PSI had the right to reproduce, distribute, and enhance the RealWorld Accounting Suite through 2010. (TAC Count XII ¶ 38.) In or about August 2000, DIB informed PSI that DIB was interested in purchasing an unlimited license for the Licensed Software. (*Id.* Count VI ¶ 19.)[13] In or about September 2000, PSI asked RealWorld "if it could purchase a license from [RealWorld] for sale to [DIB] for unlimited use of the Accounting Suite incorporated into the Licensed Software." PSI did not identify DIB in its initial discussions with RealWorld. (*Id.* Count VI ¶ 20.) PSI alleges that it did not initially disclose DIB's identify to RealWorld "because it had been cut out of a deal by [RealWorld] in which it had invested substantial time and effort." (*Id.* Count VI ¶ 22.)[14] After RealWorld and PSI signed an agreement in which RealWorld agreed "not to intervene or interfere with the transaction between PSI and its client," PSI informed RealWorld that DIB was the client for whom PSI wished to purchase unlimited use of the Accounting Suite. (*Id.* Count VI ¶ 21.)

---

[10]    PSI's counterclaims do not identify Ms. Wygant's position.

[11]    PSI does not indicate when the Committee ceased its efforts to ascertain ownership of the Programs.

[12]    As noted, paragraph 9 of the TAC alleges that the MDA was supplemented by the MVADA, executed on July 1, 1988. Count XII, however, does not mention the MVADA, and refers only to the MDA between RealWorld and PSI. Although PSI does not explain this discrepancy, the court presumes that allegations in Count XII that relate to the MDA after 1988 properly refer instead to the MVADA.

[13]    As noted, according to PSI, at this time the Committee was in the process of ascertaining ownership of the Programs. (Am. Count X ¶¶ 11-13.)

[14]    PSI does not explain the nature of this alleged deal.

In or about September 15, 2000, RealWorld agreed that "for $200,000.00 PSI could purchase a license for unlimited use of . . . the Accounting Suite for sale to DIB." (*Id.* Count VI ¶¶ 20, 23.) On an unspecified date, PSI informed DIB of this agreement and offered to sell to DIB for $1.8 million an unlimited license for a derivative work of customizations and enhancements to the Accounting Suite that PSI had developed (the "Derivative Work"). (*Id.* Count VI ¶¶ 24-27.)[15] On an unspecified date after PSI made this offer, RealWorld, through one of its distributors, approached DIB directly and offered to sell to DIB an unlimited license to the Accounting Suite for significantly less than PSI had offered. (*Id.* Count VI ¶ 30.) On approximately November 30, 2000, DIB and RealWorld entered into a Source Code Agreement in which RealWorld agreed (1) to deliver to DIB a copy of the Accounting Suite and (2) "to cooperate in any litigation which would be brought by PSI related to the unlimited license for the Accounting Suite and to indemnify it from PSI's claims." (*Id.* Count VI ¶¶ 35, 38-39, Count XII ¶¶ 40-41.) PSI alleges that DIB entered into this agreement, "in part, in a wrongful attempt to legitimize DIB's use of PSI's copyrighted code without PSI's consent." (*Id.* Count XII ¶ 41.) PSI and RealWorld maintained good business relations until DIB and RealWorld entered into the Source Code Agreement, which PSI characterizes as "a sham transaction." (*Id.* Count XII ¶ 40.)[16] DIB did not in fact install or use the copy of the Accounting Suite that RealWorld had provided; instead, DIB continued to use the Licensed Software it had obtained from PSI. (*Id.* Count VI ¶ 40.) When PSI questioned DIB about its continued use of the Licensed Software, DIB claimed that its Source Code Agreement with RealWorld gave it the right to continue to use PSI's Derivative Work, a claim which PSI contends

---

[15]     PSI does not indicate how this so-called Derivative Work differs, if at all, from the Licensed Software.

[16]     PSI does not indicate whether its relations with RealWorld deteriorated subsequent to execution of the Source Code Agreement.

DIB knew was false. (*Id.* Count VI ¶ 43.)[17]

In or about September 2000, PSI discovered that DIB had incorporated certain PSI and RealWorld source code into its purchase order module, as described below. (Am. Count IX ¶ 31.) During a telephone conversation on or about October 1, 2000, Burroughs acknowledged to PSI President John Miller that DIB had made, sold, and distributed copies of the purchase order module "without PSI's permission and without PSI's copyright notices." (Am. Count X ¶¶ 15-16.) As of November 2000, with Burroughs's knowledge, DIB had made, sold, and distributed more than 400 copies of the Programs which did include a PSI copyright notice on a "splash screen." (*Id.* ¶¶ 17-18.)[18] In or about January 2001, DIB employees, under Burroughs's direction and with his participation, removed PSI's copyright notices from copies of the Programs and replaced them with DIB copyright notices without PSI's knowledge or consent. (*Id.* ¶¶ 19, 21-22; TAC Count XI ¶¶ 41-42, 45.) PSI claims that Burroughs's "personal conduct aided and assisted DIB to make, use, sell and distribute copies of the Programs with PSI's copyright notice removed," although it is not clear whether this allegation refers to Burroughs's participation in removing PSI's copyright notices or some unspecified acts. (Am. Count X ¶ 24.)

On or about February 14, 2001, PSI served DIB with a Notice of Default letter alleging that DIB had failed to comply with the terms of the License Agreement. (TAC ¶ 27.) The letter demanded that DIB (1) pay fees, charges, and royalties owed to PSI, (2) report on sublicensing activity for the last six months of 2000, (3) stop using and sublicensing the Licensed Software, (4)

---

[17]  PSI does not identify the individuals at PSI or DIB who participated in this exchange, nor does PSI state which DIB official knew the representations were false.

[18]  A "splash screen" is "[a]n initial screen displayed by interactive software, usually containing a logo, version information, author credits and/or a copyright notice." *See* http://foldoc.doc.ic.ac.uk/foldoc/foldoc.cgi?query=splash+screen. The allegations summarized here are puzzling, as they indicate that, though DIB had removed PSI's copyright notices in October 2000, by the following month PSI's copyright notices were once again included in the software DIB distributed to its members.

certify in writing that DIB had destroyed all copies of the Licensed Software, (5) stop using all enhancements and features subject to the terms of the License Agreement and federal copyright law, (6) destroy all software containing enhancements and features, pursuant to the License Agreement, and (7) assign all sublicenses to PSI within 30 days. (*Id.* ¶ 28.) As a result of DIB's failure to comply with these demands within 30 days, PSI alleges, the parties' oral agreement was terminated on March 14, 2001. (*Id.* ¶ 29.) Prior to February 14, 2001, pursuant to the License Agreement, DIB was authorized to use and distribute to its members copies of the Programs. (TAC Count XI ¶ 39.) From February 14, 2001 through the present, however, DIB has made, used, sold, and distributed more than 700 copies of the Programs to its members throughout the United States without PSI's consent or permission, including more than 400 copies to members that had previously received the software that did include PSI's copyright notices. (TAC Count VII ¶ 42; Am. Count X ¶¶ 20, 23; TAC Count XI ¶ 40, 43.)[19]

In or about March 2001, DIB induced RealWorld to terminate the MVADA with PSI, although RealWorld had no legitimate basis for doing so. (*Id.* Count XII ¶¶ 43-44.) PSI alleges that, "[o]n information and belief, DIB sought to have Real[]World terminate PSI's M[VA]DA in order to limit or reduce damages which PSI could seek from DIB for DIB's wrongful use of PSI's copyrighted source code which was incorporated into a derivative work which PSI delivered to DIB in or about 1999." (*Id.* Count XII ¶ 45.)[20] In or about May 2001, RealWorld did in fact terminate the MVADA. (*Id.* Count XII ¶ 46.)[21] As a result of that termination, PSI experienced "interference with existing

---

[19]     PSI does not indicate whether DIB instructed these 400 members to destroy the previously-distributed copies that included PSI's copyright notices.

[20]     PSI does not describe the derivative work that was delivered to DIB in or about 1999 or indicate whether this was the same derivative work described in paragraphs 24 through 27 of Count VI of the TAC. Nor does PSI explain how termination of the PSI/RealWorld MVADA limited damages that PSI might otherwise have been able to recover from DIB.

[21]     The TAC does not indicate what reasons, if any, RealWorld proffered for terminating
(continued...)

customers which PSI was serving pursuant to the MVADA, the loss of business opportunities and business expectancies." (*Id.* Count XII ¶ 47.) On an unspecified date during the discovery process in this action, PSI became aware that DIB had breached the License Agreement by sublicensing several modules containing PSI-created Enhancements and Original Works to its members, presumably with the "splash screen" removed and without compensating PSI. (*Id.* Count I ¶ 35.)

PSI's common law fraud counterclaim essentially alleges that DIB fraudulently represented to PSI that it had created the purchase order module independently of any Licensed Software when it had in fact incorporated source code from the Programs. (Am. Count IX ¶¶ 21-30.) The common law tortious interference counterclaim asserts that DIB induced RealWorld to wrongfully terminate its MVADA with PSI. (TAC Count XII ¶ 43, 47.) The false designation of origin counterclaim alleges that DIB violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by removing PSI's copyright notices from portions of the Programs and replacing them with its own such notices. (*Id.* Count XI ¶¶ 37, 48.) Finally, PSI's contributory copyright infringement counterclaim contends that Burroughs's personal actions assisted DIB in making, using, selling, and distributing copies of the Programs on which PSI's copyright notices had been replaced with DIB's notices. (Am. Count X ¶¶ 22, 24.) As noted above, Defendant DIB moves to dismiss PSI's fraud, false designation of origin, and tortious interference counterclaims; Defendant Burroughs moves to dismiss the contributory copyright infringement counterclaim.

## DISCUSSION

### I.    Legal Standard

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court accepts all well-pleaded allegations in a counterclaim as true and draws all reasonable inferences in favor of the

---

[21](...continued)
the MVADA, or how such termination violated the MVADA, if at all.

plaintiff. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001). The court must accept a pleading's factual allegations because "a motion to dismiss tests the legal sufficiency of a pleading." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the [nonmoving party] can prove no set of facts in support of his claim which would entitle him to relief." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## II.    Fraud (Amended Count IX)

DIB contends that PSI's fraud counterclaim should be dismissed on three grounds. First, DIB urges that PSI fails to plead its fraud counterclaim with the level of particularity required by FED. R. CIV. P. 9(b). (Motion of Do it Best Corp. to Dismiss Amended Count IX of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Am. Count IX Motion") ¶ 3.) Second, according to DIB, the counterclaim "fails to state more than a breach of contract claim." (*Id.*) Finally, DIB contends that the fraud counterclaim is preempted by the ITSA. (Motion of Do it Best Corp. and Thomas Burroughs to Dismiss Counts IX, X, XI and XII of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Counts IX-XII Motion") ¶ 3.)[22] DIB urges this court to

---

[22]    DIB also contends the fraud counterclaim is preempted by § 301(a) of the Copyright Act. The court notes, however, that at least one Court of Appeals, as well as several district courts, have held that § 301 of the Copyright Act does not preempt common law fraud claims. *See Valente-Kritzer Video v. Pinckney*, 881 F.2d 772, 776 (9th Cir. 1989); *Cooper v. Sony Music Entm't Inc.*, No. Civ.A. 01-0941, 2002 WL 391693, at *5 (S.D. Tex. Feb. 22, 2002); *Tracy v. Skate Key, Inc.*, 697 F. Supp. 748, 751 (S.D.N.Y. 1988); *Brignoli v. Balch Hardy & Scheinman, Inc.*, 645 F. Supp. 1201, 1205 (S.D.N.Y. 1986); *see also* H.R. REP. NO. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748 ("[T]he general laws of defamation and fraud . . . remain unaffected as long as the causes of action contain elements . . . that are different in kind from copyright infringement"); 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1][3], p. 1-27 (2004) ("[T]he element of misrepresentation or deception . . . is no part of a cause of action for copyright infringement. Thus, there is no preemption of the state law of fraud . . ."). As the court finds PSI's fraud counterclaim fails to satisfy the requirements of Rule 9(b), does not state more than a breach of contract claim, and is preempted by the ITSA, the court need not determine whether that counterclaim is also preempted by the Copyright Act.

dismiss PSI's fraud counterclaim with prejudice on the ground that PSI has had sufficient time to draft a fraud claim that would survive a 12(b)(6) motion, but has failed to do so. (Am. Count IX Motion ¶ 4.) The court considers each argument in turn.

## A.    Particularity

DIB claims that PSI has not pleaded its fraud claim with the particularity required by Rule 9(b). Rule 9(b) provides that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." While Rule 9(b) does not require PSI to plead facts that if true would show that DIB's alleged misrepresentations were indeed false, it does require PSI to state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the [PSI]." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (internal quotation marks and citations omitted). In other words, PSI's pleading must include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). On the other hand, PSI is "not required to go further and allege the facts necessary to show that the alleged fraud was actionable." *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 524 (7th Cir. 1993). Allegations that fail to identify the agents who speak for a corporate entity do not satisfy Rule 9(b). *Kriendler v. Chem. Waste Mgmt.*, 877 F. Supp. 1140, 1155 (N.D. Ill. 1995).

Before reaching the "newspaper" questions, the court considers a threshold argument: the statute of limitations. DIB contends that it is unable from the year-long time periods alleged (1990 and 1996) to determine whether PSI's counterclaim might be barred by the statute of limitations for fraud claims. (Memorandum of Law in Support of the Motion of Do it Best Corp. to Dismiss Count IX of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Am. Count IX

Mem."), at 8.) The court notes that, in Illinois, a party has five years from the date he knew or reasonably should have known that a fraud has been perpetrated upon him to bring a claim for common law fraud. 735 ILCS 5/13-205; *Horbach v. Kaczmarek*, 288 F.3d 969, 977 (7th Cir. 2002); *Boyd Mach. & Repair Co. v. American Int'l Homes, Ltd.*, 100 F. Supp. 2d 898, 901 (N.D. Ill. 2000). PSI alleges that it did not discover that DIB had made fraudulent statements until September 2000, (Am. Count IX ¶ 31), while PSI filed its initial fraud counterclaim on October 30, 2003, within five years of the time it claims to have discovered the fraud. The court concludes that PSI has sufficiently pleaded the relevant date–the date it discovered the alleged fraud–in its fraud counterclaim to survive a motion to dismiss.

Turning next to the questions of "who, what, when, where and how," DIB also claims it cannot determine where or by what method the alleged misrepresentations were made. (Am. Count IX Mem., at 8.) The court notes that PSI did, in fact, identify the location and mode of transmission of all three alleged statements–the first two were made by telephone, and the third was uttered in person at DIB's office. (Am Count IX ¶¶ 21-23.)

The matters of "who, what, and how" are more troublesome. In its response brief, PSI insists that its fraud counterclaim alleges that "DIB, though its agent Gary Zoller," made three false statements of material fact. (Response of Passport Software in Opposition to the Motion of Do it Best Corp. to Dismiss Passport's Fraud Claim (hereinafter, "Am. Count IX Opp. Mem."), at 3.)[23] First, at some point "[i]n or about 1990," Zoller told PSI President John Miller by telephone that DIB would not use the purchase order module that PSI delivered to DIB. (Am. Count IX ¶ 21.) Second, during that conversation, Zoller claimed that DIB would create its own purchase order module "from scratch." (*Id.* ¶ 22.) Third, Zoller told Miller "[i]n or about 1996" that Jennings was the programmer

---

[23]     PSI also claims it alleged that Jim Jennings made false statements of material fact. The court notes, however, that the fraud counterclaim contains no allegations that Jennings made any statements whatsoever.

who was creating DIB's purchase order module. (*Id.* ¶ 23.) PSI claims in its response brief that the fraud counterclaim "alleged that at the time the representations were made, DIB knew or believed the statement was false." (Am. Count IX Opp. Mem., at 3-4 (citing Am. Count IX ¶¶ 24-28).) PSI also urges that its fraud counterclaim alleges that "DIB intended to induce PSI to act" and that "PSI alleged that it did act in reliance [on] DIB's representation that it was creating its own purchase order module from scratch . . . [t]hat is, PSI did not invoice DIB for the use of source code [for] which it was entitled to license fees." (Am. Count IX Opp. Mem., at 4 (citing Am. Count IX ¶¶ 29-30).)

In its reply brief, DIB insists that PSI's allegations have "a gaping hole," in that paragraphs 26, 28, 29, and 30 do not indicate on what date the alleged statements by Zoller were made. (Reply in Support of the Motion of Do it Best Corp. to Dismiss Amended Count IX of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Am. Count IX Reply Mem."), at 7-8.) As discussed above, it is not evident to this court which of Zoller's alleged statements paragraphs 26, 29, and 30 refer to.[24] Paragraph 26 involves an alleged representation by Zoller "that the purchase order module that [DIB] had created was its own creation"; paragraph 29 to a representation "that DIB's purchase order module was an original work of DIB"; and paragraph 30 to "statements . . . that [DIB] had created its own purchase order module." It is unclear whether these claims refer to Zoller's alleged 1990 statements, his alleged 1996 statement, or other unidentified remarks. The court finds therefore that DIB has not sufficiently pleaded "the who, what, and how" of its fraud counterclaim.[25]

---

[24] As noted, it is clear that the allegation in paragraph 28, involving "the representation to Miller that DIB was creating its own purchase order module," refers to the allegation in paragraph 23 "that Jennings was creating DIB's purchase order module."

[25] As the court finds that the fraud counterclaim does not describe the alleged misstatements with the requisite particularity, the court need not consider DIB's remaining arguments regarding Rule 9(b): (1) that the six-year gap between Zoller's first two allegedly false
(continued...)

## B. Comparison with Breach of Contract Claim

In Illinois, to establish common law fraud a plaintiff must prove the following elements: "(1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act [or to refrain from acting]; (4) action [or inaction] by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hefferman v. Board of Trustees of Illinois Community College Dist. 508*, 310 F.3d 522, 525 (7th Cir. 2002) (quoting *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 193, 538 N.E.2d 530, 536 (1989)); *Minor v. Fashion Enters., Inc.*, 342 Ill.App.3d 405, 420, 794 N.E.2d 902, 916 (1st Dist. 2003); *Chicago Title & Trust Co. v. First Arlington Nat'l Bank*, 118 Ill.App.3d 401, 406, 454 N.E.2d 723, 728 (1st Dist. 1983) (citing RESTATEMENT (SECOND) OF TORTS § 537 (1977)).

DIB contends that PSI's fraud counterclaim amounts to a cause of action for intentional breach of contract, which is not cognizable under Illinois law. *See Lester v. Resolution Trust Corp.*, 994 F.2d 1247, 1253 (7th Cir. 1993) (citing *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 112 Ill.2d 87, 94, 492 N.E.2d 181, 183-84 (1986)). DIB points out that PSI alleges that DIB incorporated PSI and Real World source code into DIB's purchase order module but failed to pay required royalties under the License Agreement. (Am. Count IX ¶¶ 14-16, 25, 32.) DIB also notes that all of the damages claimed in PSI's fraud counterclaim–"loss of fees, charges, and royalties from DIB; losses from the unauthorized conversion and use of its property; and attorney fees and costs"–are contained in its breach of contract claim. (*Compare* Am. Count IX ¶ 32 *with* TAC Count I ¶¶ 34, 36.)

In its response brief, PSI insists that its counterclaim asserts that "DIB intentionally misled

---

[25](...continued)
statements and the third representation "begs the question of what both [DIB] and [PSI] were doing during that six year time frame"; (2) that paragraph 30 does not indicate when PSI relied on Zoller's statement that DIB had created its own purchase order module by not invoicing DIB or its members; and (3) that DIB cannot determine which of Zoller's statements paragraph 27 refers to or whether Zoller knew "at the time of his alleged misrepresentation in Paragraph 27 that [DIB] 'had intended to incorporate source code which belonged to PSI.'" (Am. Count IX Reply Mem., at 8.)

PSI to believe that the purchase order module which PSI had delivered to DIB was not satisfactory for its business purposes." (Am. Count IX Opp. Mem., at 5.) PSI urges that

> DIB's conduct was a part of an intentional scheme to conceal DIB's use of PSI's and Real[]World's source code from PSI, to create a work utilizing PSI's and Real[]World's source code without paying the appropriate fees or obtaining the appropriate licensing, to engage in unauthorized conversion of PSI's and Real[]World's source code to create a derivative work, and to cheat PSI out of its rightful royalties and fees.

(*Id.* at 6.) In the court's view, PSI's use of the phrase "intentional scheme" reveals that its fraud counterclaim amounts to a claim for promissory fraud. (Am. Count IX Reply Mem., at 7.) Our Court of Appeals has explained that, in Illinois, "'[p]romissory fraud' is a false representation of intent concerning future conduct, such as a promise to perform a contract when there is no actual intent to do so." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citation omitted). "As a general rule, promissory fraud is not actionable in Illinois unless the promise is part of a 'scheme' to defraud." *Id.* (emphasis added). In the court's view, PSI's fraud counterclaim does not contain any allegations to support its assertion that "DIB's conduct was a part of an intentional scheme" to defraud PSI. Thus, as a claim for promissory fraud, PSI's claim fails.

Even if PSI's claim is not properly characterized as one for promissory fraud, the court finds PSI has not adequately alleged that it relied on Zoller's misrepresentations and was injured as a result of that reliance, as opposed to being injured by DIB's failure to pay royalties. As noted, PSI alleges that it "relied upon the statements by DIB, through its agent Zoller, that it had created its own purchase order module and did not invoice DIB or its members for the use of PSI or Real[]World source code in the purchase order module." (Am. Count IX ¶ 30.) The court agrees with DIB, (Am. Count IX Reply Mem., at 5), that the fact that PSI's alleged reliance consisted solely of its failure to invoice DIB or its members for use of PSI and RealWorld source code demonstrates that PSI's fraud counterclaim alleges no more than that DIB intentionally breached the License Agreement. Indeed, as noted, PSI's fraud counterclaim seeks damages relating only to DIB's

alleged breach of the License Agreement. (*Compare* Am. Count IX ¶ 32 *with* TAC Count I ¶¶ 34, 36.)

As DIB notes, our Court of Appeals has stated that a party asserting a fraud claim "must show that, had it not been for the fraud, he would have been spared an injury and thus would be better off." *Midwest Commerce*, 4 F.3d at 524-25 (citation omitted). In this case, PSI has not alleged that Zoller's misrepresentations *per se* caused it to forego some non-contractual remedy it would have had absent those statements. Instead, PSI's alleged reliance on DIB's misrepresentations, as well as the injuries PSI allegedly sustained as a result of such reliance, involve PSI's failure to invoice DIB for royalties owed under the License Agreement. PSI does not allege that it would have discovered DIB's alleged breach of the License Agreement any sooner, or invoiced DIB for greater royalty amounts, had Zoller not lied about DIB's actions. Even if it had so alleged, those circumstances might explain PSI's delay in filing its claims against DIB, but would not constitute an independent claim for relief. As PSI does not allege harm beyond its contractual expectations, the court concludes that PSI's fraud counterclaim fails to state a claim upon which relief can be granted.

## C.    Preemption by Illinois Trade Secrets Act

DIB claims that the ITSA preempts PSI's fraud counterclaim on the ground that the fraud counterclaim is predicated on the alleged misappropriation of the same property that gives rise to PSI's trade secret misappropriation claim. (Counts IX-XII Mem., at 13.) Specifically, DIB urges that PSI's fraud counterclaim merely repeats the allegations in PSI's trade secret misappropriation counterclaim, and that the fraud claim is "nothing more than another way of arguing that [DIB] took PSI's allegedly secret information, for which the ITSA is the exclusive remedy." (Reply in Support of Do it Best Corp.'s Motion to Dismiss Counts IX, XI and XII of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Counts IX, XI, XII Reply Mem."), at 13; Counts IX-XII Mem.,

17

at 13.)

PSI urges that its fraud counterclaim is "fully independent" of its trade secret misappropriation counterclaim for two reasons. First, PSI insists that its fraud counterclaim "seeks to recover damages from DIB for its fraudulent misrepresentations related to payment due under the License Agreement." (Counts IX-XII Opp. Mem., at 12.) Second, PSI claims that "at the time the initial fraudulent representation was made regarding the purchase order module, none of PSI['s] trade secrets which it is enforcing in this litigation existed[; t]hose trade secrets arose later in the relationship between PSI and DIB." (*Id.*) The court presumes that the phrase "the initial fraudulent representation" refers to Zoller's alleged 1990 statements that DIB would not use the purchase order module that PSI delivered to DIB and that DIB would create its own purchase order module "from scratch." (Am. Count IX ¶¶ 21-22.) The court also presumes that the trade secrets PSI refers to are the Programs, which it allegedly began developing in 1993. PSI cites no factual support for this contention, nor does it cite any authority (and the court found none) to support its implicit argument that a fraud claim is not preempted by the ITSA if the trade secret at issue did not exist when the alleged misrepresentation was made.

The ITSA abolished conflicting common law causes of action, except for contractual remedies, for misappropriation of trade secrets. 765 ILCS 1065/8; *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1271 (7th Cir. 1995) (citations omitted). To state a claim for misappropriation of trade secrets under the ITSA, a claimant must show that (1) its trade secret (2) was misappropriated and (3) was used in the opposing party's business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003) (citations omitted). In *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974 (N.D. Ill. 2000), plaintiff alleged, *inter alia*, that its former employee and his current employer fraudulently misrepresented and concealed that they took and used plaintiff's computers, disks, and documents containing confidential information. In granting summary judgment to defendants on plaintiff's fraud claim, the court found that the fraud allegations merely

18

restated plaintiff's claim for misappropriation of trade secrets. *Id.* As the ITSA defines misappropriation as an acquisition by improper means, including by misrepresentation, the court found, the ITSA preempted plaintiff's fraud claim. *Id.* (citing 765 ILCS 1065/2(a)).

PSI's misappropriation counterclaim alleges that the Original Works and Enhancements constitute trade secrets of PSI pursuant to the ITSA. (TAC Count II ¶ 41.) As noted, PSI's common law fraud counterclaim alleges that DIB fraudulently misrepresented to PSI that it had created the purchase order module independently of any Licensed Software when it had in fact incorporated source code from the Programs, for which PSI was entitled to royalties. (Am. Count IX ¶¶ 21-30.)[26] As in *Thomas & Betts*, this court finds that PSI's fraud counterclaim merely restates its trade secret misappropriation claim. As noted, both claims are premised on DIB's alleged misappropriation and use of certain Enhancements that PSI had created. The court finds that PSI's fraud counterclaim is premised on an acquisition by misrepresentation, and therefore is preempted by the ITSA.

### D.    Undue Delay

DIB argues that the fraud counterclaim should be dismissed with prejudice at this point, as PSI "has exercised undue delay, and has had more than a sufficient amount of time to adequately plead a cause of action." (Am. Count IX Mem., at 8-9.) In support, DIB cites a single unreported district court opinion, *Oasis Indus., Inc. v. G.K.L. Corp.*, No. 92 C 4814, 1996 U.S. Dist. LEXIS 15233, at *15-16 (N.D. Ill. Oct. 9, 1996), where Magistrate Judge Guzman recommended that the court decline to permit a further amended pleading where defendants had enjoyed "several opportunities to amend their pleadings during the course of four years of discovery." PSI responds that "the parties have only been engaged in active discovery since June of 2003." Further, PSI claims "it has been greatly hindered because of the inability of multiple DIB deponents to recall

---

[26]    As noted, the court presumes the Programs constitute a subset of those Enhancements described in PSI's trade secret misappropriation counterclaim.

relevant events and the late delivery of 60,000 incomplete documents to PSI . . . ." (Counts IX-XII Opp. Mem., at 6 n.2.) The court notes that PSI initially filed its fraud counterclaim on October 30, 2003, and amended it once, on February 9, 2004. Despite DIB's alleged noncompliance with discovery, PSI has in fact filed several previous counterclaims. The court declines at this time to bar any further amendments, but notes it has difficulty in understanding how PSI might plead a fraud counterclaim that will not be vulnerable to the legal defenses DIB has raised in this motion.

## III. Contributory Copyright Infringement (Count X)

Thomas Burroughs urges that PSI's counterclaim against him should be dismissed on the grounds that (1) PSI does not sufficiently plead a predicate act of copyright infringement, and (2) PSI fails to specifically allege that Burroughs "directed, supervised and/or participated in the removal of any copyright notices or that his conduct aided and assisted DIB to make, use, sell and distribute copies of the [Programs] with PSI's copyright notice removed." (Thomas Burroughs'[s] Motion to Dismiss Count X (Amended) of Counter-Plaintiff['s] Third Amended Counterclaims ¶ 5.) PSI responds that its counterclaim satisfies the notice pleading requirements of Rule 8(a). (Response of Passport Software, Inc. in Opposition to the Motion to Dismiss of Thomas Burroughs (hereinafter, "Am. Count X Opp. Mem."), at 2-3.) In fact, unlike its fraud counterclaim, PSI's contributory copyright infringement counterclaim need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Such a statement need merely "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 507 (2002) (citation omitted). A party need not plead either facts or law under Rule 8(a). *Johnson v. Wattenbarger*, 361 F.3d 991, 994 (7th Cir. 2004) (citations omitted).

A contributory infringer is one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner." *Sony Corp.*

of *Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 418 (1984). A party may be held jointly and severally liable for infringement if he has knowledge of the infringing activity and directly participates in the infringing activity or induces, causes, or materially contributes to the infringing conduct of another. *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2001 WL 58950, at *10 (N.D. Ill. Jan. 22, 2001); *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1090 (D. Md. 1995). Our Court of Appeals has explained that a copyright holder may sue a contributor to copyright infringement in effect as an aider and abettor. *In re Aimster Copyright Litig.*, 334 F.3d 643, 645-46 (7th Cir. 2003). "[O]ne thinks of a contributory infringer as someone who benefits directly from the infringement that he encourages." *Id.* at 654. The court in *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926), held that "in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction." The *Dangler* court explained that an officer is held jointly liable with the company when he "acts willfully and knowingly–that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Id.* One district court has explained that "despite its vintage, *Dangler* remains the law of this Circuit." *Syscon, Inc. v. Vehicle Valuation Servs., Inc.*, 274 F. Supp. 2d 975 (N.D. Ill. 2003) (citing *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 694 (N.D. Ill. 2002); *The Drink Group, Inc. v. Gulfstream Communications, Inc.*, 7 F. Supp. 2d 1009, 1010 (N.D. Ill. 1998)).

In order to establish contributory infringement, a party must establish a predicate act of direct infringement. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct

21

infringement by a third party") (citation omitted); 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (hereinafter, "NIMMER") § 12.04[A][3][a], p. 12-91 (2004) ("[T]he rule should generally prevail that third party liability, as its name implies, may exist only when direct liability, i.e., infringement, is present"). Copyright infringement is actionable under § 501(a) of the Copyright Act, which provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright . . . ." 17 U.S.C. § 501(a). The exclusive rights of a copyright holder include reproducing, preparing derivative works of, and distributing copies of the copyrighted work. 17 U.S.C. § 106(1)-(3). Thus, PSI must show (1) the existence of a predicate act of infringement, and (2) that Burroughs induced, caused, or materially contributed to the infringing conduct. The court considers each element in turn.

### A.     Predicate Act of Copyright Infringement

According to Burroughs, PSI's contributory copyright infringement is premised solely on its allegation that in or about January 2001, DIB employees, under Burroughs's direction and with his participation, removed PSI's copyright notices from the Programs' splash screens without PSI's knowledge or consent and replaced them with DIB's copyright notices. (Memorandum of Law in Support of Thomas Burroughs'[s] Motion to Dismiss Count X (Amended) of Counter-Plaintiff['s] Third Amended Counterclaims (hereinafter, "Am. Count X Mem."), at 3.) PSI points to its allegation that Burroughs was a member of the committee of DIB employees that was advised by third parties that DIB needed to purchase or license PSI's rights in order to continue using PSI software. (Am. Count X ¶¶ 12-13.)[27] It also cites its allegation that Burroughs's "personal conduct aided and assisted DIB to make, use, sell and distribute copies of the Programs with PSI's copyright notice removed." (*Id.* ¶ 24.) Burroughs does not address these allegations.

---

[27]     PSI's pleadings do not indicate whether Burroughs advised DIB of the potential legal implications of its actions.

Burroughs claims that removal of copyright notices, without more, does not constitute an act of copyright infringement, and is only punishable by criminal sanction pursuant to § 506(d) of the Copyright Act, 17 U.S.C. § 506(d), which prescribes a criminal fine of up to $2,500 for removing or altering a notice of copyright from a copy of a copyrighted work with fraudulent intent. (Am. Count X Mem., at 3-4.) At least some authority supports his argument. In *Scarves by Vera, Inc. v. American Handbags, Inc.*, 188 F. Supp. 255, 257 (S.D.N.Y. 1960), the court concluded it had no power to enjoin defendant from removing plaintiff's copyright notices. *See also* 4 NIMMER § 15.02, at 12-91 ("[R]emoval or alteration of a copyright notice upon a copyrighted work (whether or not with fraudulent intent) likewise does not give rise to civil liability for copyright infringement"). Burroughs also notes that the right to place or remove a copyright notice is not enumerated as a protected act in § 106 of the Copyright Act. (Am. Count X Mem., at 4.) In addition, Burroughs cites *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 913 (11th Cir. 1986), in which the court stated that "permitting private plaintiffs to seek relief under section 506 is inconsistent with the overall scheme of the legislation . . . ." Burroughs fails to cite the remainder of the court's statement, however: "private parties have adequate means available by which to seek relief under other provisions of the Act which will yield more appropriate relief." *Id.*

Burroughs also cites *Cinema Concepts Theatre Serv. Co. v. Filmack Studios*, No. 89 C 0024, 1989 WL 55092, at *2 (N.D. Ill. May 17, 1989), but as the court reads that case, it addressed state law claims. Plaintiff in *Cinema Concepts* alleged, *inter alia*, that defendant misappropriated its property and engaged in unfair competition by removing its copyright notice from its films without its consent or authorization. In dismissing these state law claims, the court noted that plaintiff sought to recover for injuries allegedly sustained as a result of the removal of the copyright notice, not for the subsequent acts of reproduction. *Id.* Defendant's removal of the notice allegedly "facilitat[ed] the copying of plaintiff's copyrighted films" and allowed customers to purchase films

from defendant that they otherwise would not purchase, but removal of the notices did not itself injure the plaintiffs. Accordingly, the removal claims were preempted by § 301 of the Copyright Act. *Id.* at *3. As in *Cinema Concepts*, PSI was injured not by deletion of its copyright notices, but by the alleged misuse of its copyrighted work.

Removal of copyright notices may not, standing alone, be actionable under the Copyright Act, but PSI's claims against Mr. Burroughs will survive a 12(b)(6) motion if they sufficiently allege Burroughs's participation in actions that do constitute copyright infringement. At least one Circuit Court of Appeals has found that removal and replacement of a copyright notice can constitute evidence of copyright infringement. *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 497 (4th Cir. 1996) ("[T]he most telling evidence of willful infringement in this case is [individual defendant's] underhanded purchase of [copyrighted animal mannequins] using pseudonyms, his removal of [plaintiff's] copyright notice from those forms, and his attachment of his own copyright notice"). In this case, PSI alleges that Burroughs's participation in removing and replacing PSI's copyright notices aided and abetted DIB in infringing PSI's copyright. The court turns, then, to consider whether these acts of participation are sufficient to satisfy the notice pleading requirements of Rule 8(a).

## B.      Burroughs's Alleged Contribution to Copyright Infringement

Burroughs contends that PSI has not alleged sufficient facts regarding Burroughs's contribution to allegedly infringing acts to support its claim that Burroughs aided and abetted the alleged infringement. (Am. Count X Mem., at 5.) Specifically, Burroughs urges that PSI does not allege that he knew DIB intended to infringe PSI's copyright, that he induced, caused, or materially contributed to the making, using, selling, or distributing of PSI software, or that he participated in making, using, selling, or distributing copyrighted works. (*Id.* at 9-10; Thomas Burroughs'[s] Reply Brief in Support of His Motion to Dismiss Count X (Amended) of Counter-Plaintiff['s] Third Amended

24

Counterclaims, at 7.) To support these contentions, Burroughs cites several district court decisions. (Am. Count X Mem., at 5-6.)

In *Cable News Network, L.P. v. GoSMS.com, Inc.*, No. 00 Civ. 4812(LMM), 2000 WL 1678039, at *6 (S.D.N.Y. Nov. 6, 2000), plaintiffs alleged that defendant's manager and director, by virtue of their positions and shareholdings, controlled the affairs of defendant and were personally involved in the alleged infringing conduct. Absent allegations of acts of infringement, supervision, or control over the direct infringers, or contribution to the infringement, the court concluded that plaintiffs' allegations were "insufficient to plead either direct copyright or trademark infringement or either contributory infringement or vicarious liability." *Id.* The court explained that copyright infringement claims require "allegations of acts of infringement, supervision or control over the direct infringers, or contribution to the infringement." *Id.* (citing *Carell v. The Shubert Org., Inc.*, 104 F. Supp. 2d 236, 271 (S.D.N.Y. 2000)). Although PSI does not address this case, the court finds it distinguishable. As noted, PSI has alleged that Burroughs knew, through his membership on a DIB committee, that DIB needed to purchase or license PSI's rights to avoid infringing PSI's copyright, and that Burroughs acknowledged to Miller that, without PSI's permission, DIB had made, sold, and distributed copies of the purchase order module from which copyright notices had been removed. Despite this knowledge, Burroughs allegedly directed and participated in removing PSI copyright notices and replacing them with DIB notices. (Am. Count X ¶¶ 12-13, 15-16, 19, 21-22.)

In *DEV Industries, Inc. v. Rockwell Graphic Systems, Inc.*, No. 91 C 7197, 1992 WL 100908, at *1, *3 (N.D. Ill. May 4, 1992), plaintiff alleged that individual officers of defendant corporation had been engaged in a "complex and integrated scheme to eliminate [plaintiff] as a competitor and to drive it out of business," that they were "the moving, conscious, and dominant force" behind corporate defendant's unfair trade practices, and that they knew about and/or

encouraged corporate defendant's allegedly offending conduct. In dismissing claims against the individual defendants, the court found that plaintiff's allegations were insufficient as plaintiff failed to identify any specific activity based upon personal knowledge or wrongdoing, as opposed to their membership in the broader organizational structure. *Id.* at *3 (citing *Cinema Concepts*, 1989 WL 55092). Here, in contrast, PSI has alleged, albeit in conclusory fashion, that Burroughs knew about DIB's alleged infringement and that he directed and participated in acts that furthered DIB's allegedly infringing conduct.

In *The Drink Group, Inc. v. Gulfstream Communications, Inc.*, 7 F. Supp. 2d 1009 (N.D. Ill. 1998), Plaintiff sought to hold corporate officers individually liable for trademark infringement on the ground that they were "a principal of and a driving force behind" the allegedly infringing conduct. The court dismissed these claims, citing *Dangler* and *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996), in which the court explained that "when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation." In *Drink Group*, plaintiff failed to allege any acts of wrongdoing by the defendant officers. *Id.* at 1010-11. The mere fact that these individuals had formed a corporation that allegedly infringed was insufficient, absent any allegations of improper motivation. *Id.* at 1011. In other words, the court found that "[p]laintiff's averments fall woefully short of the 'special showing' requirement in *Dangler*." *Id.* Similarly, in *Cinema Concepts*, 1989 WL 55092, at *2, the court dismissed a claim for contributory copyright infringement on the ground that there were no factual allegations to establish that the individual defendants supervised, influenced, or otherwise knowingly participated in the alleged infringement, or that either defendant derived financial benefit from it.

To support its contention that its counterclaim does adequately allege Burroughs's

participation in infringing activities, PSI relies chiefly on *Syscon*, in which defendants engaged

plaintiff to develop a customized software program. 274 F. Supp. 2d 975. The relationship ended

before plaintiff completed the software, and defendants engaged a third party to complete the

program using the source code that plaintiff had already developed. *Id.* Plaintiff sought to hold Neil

Blitstein, president of defendant corporation, personally liable for the alleged acts of copyright

infringement on the source code. *Id.* In moving to dismiss the claim against him, Blitstein argued

that plaintiff had not alleged that he acted in an individual capacity, as opposed to his capacity as

the corporation's president. *Id.* at 975-76. The court declined to dismiss the claim, however, noting

that the complaint included numerous specific allegations that Blitstein had personally directed and

participated in allegedly infringing activity, and had personally authorized that activity. *Id.* at 977.[28]

PSI also points to *Peaceable Planet, Inc. v. TY, Inc.*, 185 F. Supp. 2d 893, 894-95, 896-97

(N.D. Ill. 2002), in which plaintiff alleged that H. Ty Warner, the founder, president, CEO, and sole

shareholder of defendant corporation, was liable for infringement. The court noted that the

complaint alleged the Warner was responsible for overseeing the development, marketing, and

sales of the infringing items; personally participated in the design of the infringing items; approved

and authorized the corporation's actions; and personally promoted the sales of the infringing items.

*Id.* at 896-897. These allegations were adequate, in the court's view, to survive a 12(b)(6) motion,

as they supported the inference that Warner personally participated in the manufacture or sale of

---

[28]     The allegations concerning Blitstein's conduct were considerably more detailed than
those before this court. Specifically, the complaint alleged that Blitstein had provided third parties
with copies of the software; was in a position to control the Copyrighted Software; had authorized
the copying, modification and use of the Copyrighted Software; had "induced and/or materially
contributed to the infringing conduct of the other defendants"; had personally directed and
authorized the unlawful conduct; had personally profited from the acts of copyright infringement;
had used, distributed, sold, offered for sale, displayed, advertised, and promoted, without plaintiff's
consent, the Copyrighted Software; had "personally directed and participated in the copying of the
source code and authorized its dissemination and use for making additional copies and/or
derivative works"; and had acted willfully and with knowledge of plaintiff's copyrights. *Syscon*, 274
F. Supp. 2d at 976-77.

the infringing article. *Id.* at 897.

Burroughs notes that, unlike the individual defendants in *Syscon* and *Peaceable Planet*, he was not an officer of DIB. As the court reads these cases, status as an officer of a corporation that has allegedly infringed a copyright, without more, is not a basis for liability as a contributory infringer; instead, the alleged contributory infringer must have acted "willfully or knowingly" or must have "personally participated" in the alleged infringement. None of these cases suggests, however, that one *must be* an officer in order to be held liable as a contributory infringer.[29]

The court notes that PSI did allege that Burroughs acted "willfully and knowingly" by "personally participat[ing] in the manufacture or sale of the infringing article." In the court's view, a requirement that, at the pleading stage, PSI must make a further "special showing" of participation in copyright infringement would go beyond the requirements of Rule 8(a)(2). The court notes that *Dangler* apparently involved a judgment on the merits, rather than a motion to dismiss. *See* 11 F.2d at 945 (citing *Maxim Mfg. Co. v. Imperial Mach. Co.*, 286 F. 79 (7th Cir. 1923)). Indeed, the *Dangler* decision did not involve application of Rules 8 or 12(b)(6), as the Federal Rules of Civil Procedure were adopted 14 years after *Dangler* was decided. Thus, *Dangler* arguably sets forth an evidentiary standard, rather than a heightened pleading requirement for contributory copyright infringement claims. Notably, in *Mid America Title Co. v. Kirk*, 991 F.2d 417, 421 (7th Cir. 1993), our Court of Appeals rejected defendant's contention claim of copyright infringement requires heightened specificity. Such a requirement, the court explained, would be akin to Rule 9(b). *Id.* Instead, the court explained, "[c]omplaints for copyright infringement simply alleging present ownership by plaintiff, registration in compliance with the applicable statute, and

---

[29]     Burroughs cites three other cases, but the court finds them distinguishable as the courts did not address the pleading requirements for a contributory copyright infringement claim. *See Assessment Techs. v. WIREdata, Inc.*, 350 F.3d 640, 644 (7th Cir. 2003); *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL 22038593 (N.D. Ill. Aug. 28, 2003); *Apple Computer, Inc. v. Microsoft Corp.*, 821 F. Supp. 616, 625 (N.D. Cal. 1993), *aff'd*, 35 F.3d 1435 (9th Cir. 1994).

infringement by defendant, have been held sufficient under the rules." *Id.* at 421 n.8 (quoting 5 CHARLES A. WRIGHT & ARTHUR A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1237, at 283 (1990)) (quotations marks omitted).

In light of *Kirk* and *Aimster*, 334 F.3d at 645-46, the court concludes that PSI's claim for contributory copyright infringement requires no more than the following three allegations: (1) that PSI owned a valid copyright; (2) that it registered in compliance with the applicable statute; and (3) that Burroughs aided and abetted DIB's infringement. In the court's view, PSI has satisfied these requirements. PSI alleges that PSI owned a valid, registered copyright. Further, PSI claims that (1) Burroughs was a member of the committee of DIB employees that was told by third parties that DIB needed to purchase or license PSI's rights to continue to use PSI software, (2) Burroughs acknowledged to Miller that, without PSI's permission, DIB had made, sold, and distributed copies of the purchase order module from which copyright notices had been removed, (3) Burroughs directed and participated in the removal of PSI's copyright notices without PSI's knowledge or consent, and (4) Burroughs's "personal conduct aided and assisted DIB to make, use, sell and distribute copies of the Programs with PSI's copyright notice removed." (*Id.* ¶¶ 12-13; 15-16, 19, 21-22, 24.) Mr. Burroughs is, of course, invited to raise any defenses to PSI's claim, such as evidence of his belief that deleting PSI's copyright notice was appropriate for some reason or a lack of evidence that he was aware of DIB's infringement, in a motion for summary judgment. His 12(b)(6) motion is denied.

## IV.    False Designation of Origin (Count XI)

DIB contends that the Copyright Act takes precedence over PSI's false designation of origin counterclaim, as PSI's copyright infringement and false designation of origin claims "are effectively the same." (Counts IX-XII Mem., at 12.) In its false designation of origin counterclaim, PSI alleges that DIB violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by removing PSI's copyright

notices from portions of the Programs and replacing them with its own such notices. (TAC Count XI ¶¶ 37, 48.) To prevail, PSI must prove the following three elements: "(1) that [DIB] used a false designation of origin . . . in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that [PSI] . . . believes [it] is likely to be damaged as a result of the misrepresentation." *Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 695-96 (7th Cir. 1999) (citation omitted). Put more simply, PSI may prevail if it establishes "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of [DIB's] product." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (quotation marks and citation omitted).

The Copyright Act does not preempt the Lanham Act, or vice versa, and therefore a party may recover under both statutes. *See, e.g., Alameda Films SA de CV v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482-83 (5th Cir. 2003); *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994). As Professor Nimmer explains, the Copyright Act "does not in any manner repeal or otherwise affect other federal statutes that may in some degree overlap with the Copyright Act . . . . Nonetheless, courts have limited application of the Lanham Act so as not to encroach on copyright interests." 1 NIMMER § 1.01[D], p. 1-66.6 (2004). The Second Circuit has found that, "as a matter of law, a false copyright notice alone cannot constitute a false designation of origin within the meaning of 43(a) of the Lanham Act." *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995). Several district courts, however, have disagreed with the *Lipton* court's conclusion that the act of placing a copyright notice on an infringing product cannot be a false designation of origin under section 43(a). *Montgomery v. Noga*, 168 F.3d 1282, 1298 (11th Cir. 1999) (collecting cases).

Although neither party so characterizes it, the court observes that PSI's false designation of origin counterclaim amounts to a "reverse passing off" claim, in which a producer misrepresents someone else's goods or services as its own. *Dastar Corp. v. Twentieth Century Fox Film Corp.*,

539 U.S. 23, 27 n.1 (2003) (citation omitted). Such claims often merely involve removing the owner's mark from a product, adding the infringer's own mark, and selling the product without altering it in any other way. *Montgomery*, 168 F.3d at 1299 n.27. In *Dastar*, plaintiff Twentieth Century Fox Film Corporation ("Fox"), the owner of a copyright on "Crusade in Europe," a television series about World War II, allowed the copyright to expire, leaving the series in the public domain. 539 U.S. at 25-26. Subsequently, plaintiffs SFM Entertainment ("SFM") and New Line Home Video, Inc. ("New Line"), in turn, acquired from Fox the exclusive rights to manufacture and distribute videos of the series. *Id.* at 26. When defendant Dastar Corp. released a video set based on the series, without mentioning the Crusade television series, plaintiffs Fox, SFM, and New Line sued *inter alia* under § 43(a), claiming false designation of origin. *Id.* at 26-27. The Court explained that the phrase "origin of goods" in § 43(a) "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. To hold otherwise, the Court explained, "would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do." *Id.* Had defendant bought some of plaintiffs' videotapes and "merely repackaged them as its own," the Court would have sustained plaintiffs' false designation of origin claim. *Id.* at 31. As defendant had accurately identified itself as the manufacturer of the videos, however, the Court found that no false designation of origin had occurred. *Id.*

DIB urges that PSI's copyright infringement and false designation of origin counterclaims are predicated on the same wrongful act, i.e., replacement of PSI's copyright notices with DIB's notices. (Counts IX-XII Mem., at 12-13.) In light of *Dastar*, however, the fact that Copyright and Lanham Act claims are predicated on the same wrongful act is not fatal to PSI's Lanham Act claim. In this case, PSI alleges that DIB employees removed PSI's copyright notices from the Programs' splash screens without PSI's knowledge or consent and replaced them with its own copyright

notices. (TAC Count XI ¶¶ 41-42, 45.) According to PSI, since February 14, 2001, DIB has made, used, and distributed copies of the Programs to its members throughout the United States without PSI's consent. (*Id.* Count XI ¶ 40, 43.) Indeed, DIB acknowledges that "PSI does not allege that [DIB] did anything more than replace [its] copyright notice." (Counts IX, XI, XII Reply Mem., at 4 n.4.) In the court's view, it is possible that PSI could demonstrate that DIB "merely repackaged [the Programs] as its own." *See Dastar*, 539 U.S. at 31.

DIB notes that several paragraphs in PSI's Lanham Act claim are nearly identical to the allegations set forth in its copyright infringement claim. (*Compare* Count VII ¶¶ 38-42 *with* Am. Count X ¶¶ 38-41.) DIB points out that several district courts in this circuit have applied the preemption principles for § 301(a) of the Copyright Act to claims brought under § 43(a) of the Lanham Act and found that claims which merely state that a copyright notice was removed must be dismissed. *See Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1013-14 (N.D. Ill. 2000) (collecting cases and rejecting Lanham Act claims because "plaintiffs have done nothing more than reallege their copyright claims under the guise of the Lanham Act"). The court notes, however, that these decisions, which are not precedential, predate *Dastar*, which is binding on this court. In light of the principles set forth in *Dastar* and the liberal pleading standards of Rule 8(a)(2), discussed above, and drawing all inferences in favor of PSI, the court declines to dismiss PSI's false designation of origin counterclaim.

## V.    Tortious Interference with Contract (Count XII)

In Count XII of the Third Amended Counterclaim, PSI alleges that DIB tortiously interfered with the MVADA between PSI and RealWorld by inducing RealWorld to terminate that contract. As with the fraud counterclaim, DIB contends that PSI's tortious interference counterclaim should be dismissed on the ground that it is preempted by both the Copyright Act and the ITSA. (Counts IX-XII Motion ¶ 4.) The court considers each argument in turn.

## A.    Preemption by Copyright Act

The elements of a tortious interference with contract claim are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages." *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 527-28 (7th Cir. 2003) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154-55, 545 N.E.2d 672, 676 (1989)).  DIB maintains that the Copyright Act preempts PSI's tortious interference counterclaim on the ground that it is equivalent to its copyright infringement counterclaim, as both counterclaims are based on the same alleged wrongful use of PSI's software.  (Counts IX-XII Mem., at 9.)  DIB notes that PSI alleges in its tortious interference counterclaim that DIB entered into the Source Code Agreement,[30] "in part, in a wrongful attempt to legitimize DIB's use of PSI's copyrighted code without PSI's consent." (TAC Count XII ¶ 41.)  The remaining allegations in the counterclaim, DIB contends, "only involve the alleged repercussions of [DIB's] purported copyright infringement." (Counts IX, XI, XII Reply Mem., at 7.)  PSI responds that its tortious interference counterclaim is predicated on DIB's alleged inducement to RealWorld to terminate its Master Distributor Agreement with PSI.  (Counts IX-XII Opp. Mem., at 7.)  As noted, PSI alleges that, in or about March 2001, DIB induced RealWorld to terminate the MVADA with PSI, although RealWorld had no legitimate basis for doing so.  (TAC Count XII ¶¶ 43-44.)

In *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F. Supp. 2d 953, 956 (N.D. Ill. 2002), plaintiff, which developed and sold software to automobile dealerships, had

---

[30]    As noted, PSI alleges that the Source Code Agreement between RealWorld and DIB provided that RealWorld would (1) deliver to DIB a copy of the Accounting Suite and (2) "cooperate in any litigation which would be brought by PSI related to the unlimited license for the Accounting Suite and to indemnify it from PSI's claims." (*Id.* Count VI ¶¶ 35, 38-39, Count XII ¶¶ 40-41.)

developed computer software and agreed to license it to defendant Rockenbach Chevrolet Sales, Inc. ("Rockenbach"), an automobile dealership, on the condition that Rockenbach not re-license or sell the software to third parties and not copy or create derivative works from the software. Plaintiff claimed that Rockenbach breached this agreement by allowing defendant Auto eDirect.Com, Inc. ("Auto eDirect"), which also developed and sold software to automobile dealerships, to view, access, and copy that software. *Id.* Plaintiff also brought a tortious interference with contract claim against Auto eDirect based on Auto eDirect creating software that "closely functioned and resembled [plaintiff's] licensed software." *Id.* at 959. In concluding that the Copyright Act preempted plaintiff's tortious interference claim, the court found that claim was based on Auto eDirect's creation of software that resembled and functioned similarly to plaintiff's licensed software, and thus that the allegations were not qualitatively different from unauthorized copying, the conduct necessary to support a copyright infringement claim. *Id.*

In contrast, PSI's counterclaim is based on DIB's alleged inducement of a licensor of copyrighted material (RealWorld) to breach its contract with PSI, rather than on DIB's creation of allegedly infringing software. In the court's view, DIB's alleged inducement of RealWorld to breach its License Agreement with PSI constitutes an "additional element" that differs in kind from those necessary for the alleged infringement of PSI's underlying copyright. *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 677 n.26 (7th Cir. 1986). In other words, PSI's tortious interference with contract claim is based on DIB's allegedly inducing RealWorld to terminate its MVADA with PSI, not on DIB's infringement of PSI-owned software. The court notes, further, that PSI alleges all five elements of a tortious interference claim: (1) it had a valid and enforceable contract with RealWorld; (2) DIB was aware of this contractual relation; (3) DIB intentionally and unjustifiably induced breach of the contract; (4) RealWorld subsequently breached the contract, caused by DIB's wrongful conduct; and (5) PSI sustained damages. *See Voelker*, 353

F.3d at 527-28. The court finds, therefore, that the Copyright Act does not preempt PSI's tortious interference counterclaim.

### B.    Preemption by Illinois Trade Secrets Act

Finally, DIB claims that the ITSA preempts PSI's tortious interference counterclaim on the ground that it is predicated on the same alleged conversion of information or property that gives rise to its trade secret misappropriation claim. (Counts IX-XII Mem., at 13.) As with its Copyright Act preemption argument, DIB notes that PSI alleges in its tortious interference counterclaim that DIB entered into the November 30, 2000 Source Code Agreement with RealWorld "in part, in a wrongful attempt to legitimize DIB's use of PSI's copyrighted code without PSI's consent." (TAC Count XII ¶ 41.) DIB urges that this allegation merely states that DIB misappropriated PSI's trade secret and that all of the other acts alleged in PSI's tortious interference counterclaim relate back to such misappropriation. (Counts IX, XI, XII Reply Mem., at 11.) In support, DIB notes that in *Thomas & Betts*, 108 F. Supp. 2d at 974, the court granted summary judgment to defendants on plaintiff's tortious interference with business relations claim on the basis of preemption under § 8 of the ITSA. The court noted that plaintiff cited the same acts of wrongdoing that comprised its unfair competition allegations and argued that this conduct damaged its relationships with its customers. *Id.* "In other words, [plaintiff] claims that defendants tortiously interfered with [its] relationships with its customers by engaging in a misappropriation of–i.e., unauthorized 'use of' (765 ILCS 1065/2(b)(2))–trade secrets and confidential information." *Id.*

PSI responds that its tortious interference counterclaim is based on DIB's alleged interference with the MVADA between PSI and RealWorld, not on misappropriation of trade secrets, and that its tortious interference counterclaim "would lie irrespective of whether DIB took PSI's trade secrets." (Counts IX-XII Opp. Mem., at 11-12.) As noted above, unlike plaintiff in *Thomas & Betts*, PSI alleges that DIB interfered with its relationship with a licensor of software

35

(RealWorld), (TAC Count XII ¶ 40), as well as relations with PSI's relations with its existing customers, rather than on DIB's misappropriation of trade secrets. (*Id.* ¶ 47.) In other words, PSI's ITSA claim is based on DIB's alleged misappropriation of PSI's trade secrets in violation of its License Agreement with PSI, while PSI's tortious interference with contract claim stems from DIB's alleged interference with the MVADA between PSI and RealWorld. As these claims involve two distinct contracts, the court finds that PSI's counterclaim is not preempted by the ITSA.

## CONCLUSION

The court grants in part and denies in part the Motion of Do It Best and Thomas Burroughs to Dismiss Counts IX, X, XI, and XII (Doc. No. 121-1). Specifically, the court dismisses PSI's Amended Count IX without prejudice to refiling, but denies the motion to dismiss with respect to Amended Counts X, XI, and XII. The court denies Thomas Burroughs's Motion to Dismiss Amended Count X (Doc. No. 152-1), and grants Do It Best's Motion to Dismiss Amended Count IX (Doc. No. 153-1) without prejudice. Defendants are directed to file answers to Amended Counts X, XI, and XII within 21 days.

ENTER:

Dated: July 23, 2004

Rebecca R. Pallmeyer

REBECCA R. PALLMEYER
United States District Judge

36