UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DO IT BEST CORP.,                        )
                                         )
                Plaintiff,               )
                                         )
        v.                               )   No. 01 7674
                                         )
PASSPORT SOFTWARE, INC.,                 )   Judge Rebecca R. Pallmeyer
                                         )
                Defendant                )
_____  )
                                         )
PASSPORT SOFTWARE, INC.,                 )
                                         )
                Counter-Plaintiff,       )
                                         )
        v.                               )
                                         )
DO IT BEST CORP.,                        )
                                         )
                Counter-Defendant.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff/Counter-Defendant Do It Best Corp., ("DIB" or "Do It Best"), an Indiana

corporation, operates a hardware cooperative of some 4500 member stores. Defendant/Counter-

Plaintiff Passport Software, Inc., ("Passport" or "PSI"), an Illinois corporation, is a licensed reseller

of certain point-of-sale software owned by RealWorld Corporation. On January 19, 1989, Passport

and Do It Best entered into a written Dealer License Agreement by which Passport licensed the Real

Wold software to Do It Best in return for royalty payments. Over the years from January 1994

through February 2001, Passport provided DIB with custom modifications to the licensed software.

DIB contends it purchased these modifications. Passport insists that although DIB paid development

fees to PSI for some of the modifications, DIB did not ever purchase software and only had rights to use the Passport software pursuant to the license.

The software furnished to DIB by PSI included a copyright notice, and PSI now holds federally-registered copyrights in the software at issue in this case. In late September 2000, PSI learned that DIB had deleted copies of PSI's copyright notice from what PSI claims is licensed software and was distributing the software without permission and without paying license fees. PSI issued a notice of default, and this lawsuit followed. DIB seeks a declaration that it is not in breach of the parties' 1989 agreement, and PSI has countersued, asserting claims against DIB and its general counsel, Thomas Burroughs. After voluntarily dismissing certain of those claims, PSI filed a Third Amended Counterclaim in which it charged DIB with breach of contract (Count I); trade secret misappropriation (Count II); civil conspiracy (Count VI); copyright infringement (Count VII); fraud (Count IX); violations of the Lanham Act (Count XI) and tortious interference with contract (Count XII). In addition, PSI claimed that Burroughs is guilty of contributory copyright infringement (Count X). In an earlier opinion, this court dismissed the fraud claim, but denied Defendants' motions to dismiss the contributory copyright infringement claim, the Lanham Act claim, and the tortious interference claim.

Nine motions for summary judgment are now before the court. In six separately-filed motions, DIB seeks judgment in its favor on PSI's trade secret, civil conspiracy, copyright infringement, breach of contract, tortious interference, and Lanham Act claims. In a seventh motion, DIB also seeks partial summary judgment on PSI's claims for damages. PSI has filed its own cross-motions for summary judgment on the copyright infringement claim and Lanham Act claims.

2

In this opinion, the court addresses the motions for summary judgment on copyright infringement, breach of contract, trade secret misappropriation, civil conspiracy, and damages.

## FACTS

An introduction to the facts at issue here is set forth in this court's opinion on DIB's motion to dismiss. *See Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2004 WL 1660814 (N.D. Ill. July 23, 2004). Recognizing that the facts Passport alleged in its counterclaim were presumed true at that stage–a presumption that Passport no longer enjoys–the court nevertheless refers the reader to that earlier opinion for context. For each of their nine motions for summary judgment, the parties have submitted separate Local Rule 56.1 Statements, many of which contain the same information. The exhibits, stacked together, reach nearly the waist of a tall female judge. Rather than attempting to create one comprehensive narrative from the parties' multiple submissions, the court will present a brief synopsis here, and identify more specific facts relevant to each motion together with the analysis of that motion.

PSI is engaged in the business of developing and licensing business software. In the 1980's, PSI entered into an agreement with RealWorld Corporation under which PSI was licensed to use certain RealWorld software, to modify and enhance that software and, to the extent of such modifications, to add PSI's own copyright and trade secrets notices to those of RealWorld. (Master Distributor Agreement, PSI Exhibit G, ¶¶ 4.4, 12.1.) The relationship between PSI and DIB began in 1989, when the parties entered into a Dealer License under which PSI delivered a version of the RealWorld software that PSI had enhanced and converted to a programming language compatible with DIB's business. DIB distributed the program to hundreds of its member stores. Beginning in 1992, PSI developed modifications and enhancements to the program at DIB's request, and DIB

itself also modified and enhanced the program. Under the terms of the Dealer License, all of those enhancements, regardless of their authorship, were subject to the terms of the License, in which PSI and RealWorld retained rights in the copyrights and trade secrets in the software. (Dealer License for RealWorld Software, PSI Exhibit I, ¶¶ 6.1, 6.2.)

The Dealer License provided for a five-year term, renewable under certain circumstances for an additional five years. Although DIB now asserts that the agreement terminated in 1994, the parties' business dealings continued; both parties continued to enhance and modify the software including, in 1996 and 1997, modifications to render the code "Y2K-compliant." PSI obtained copyright protection over this version of the software, now known as "RW2000®," in 2002. (Copyright registrations, PSI Exhibits D, F.) In August or September 2000, DIB asked PSI to propose a price for DIB's purchase of an "unlimited right" to the software. RealWorld offered to sell its rights for $200,000, (Undated e-mail message from Ellen Saley, PSI Exhibit FFF), and PSI offered to sell DIB an unlimited right to use the enhanced software for $1.8 million. DIB made a counteroffer of $250,000 and asked PSI to assist in determining which portions of the software were owned by RealWorld and which by PSI. (Wygant Letter of 9/19/00, PSI Exhibit GGG; Williams memorandum of 9/20/00, PSI Exhibit HHH.) In the course of doing so, PSI claims it learned for the first time that DIB had copied code written by PSI and was using it in a module without paying license fees for that module. (Miller Letter of 10/2/00, PSI Exhibit LLL.)

Still later, PSI discovered that DIB was engaged in direct negotiations with RealWorld's successor corporation, Great Plains Software, Inc., for purchase of RealWorld's source code. (Undated Schafer e-mail, PSI Exhibit OOO.) On November 30, 2000, DIB and Great Plains entered into an agreement by which Great Plains sold software to DIB for $150,000 and agreed to

4

"cooperate in good faith in any litigation" between DIB and PSI concerning the rights in the software. (Great Plains Source Code License Agreement, DIB Exhibit 2, ¶¶ 2(d)(iv)(a), 9(b).) DIB did not in fact use the software it had purchased from Great Plains, however. Karla Wygant, DIB's manager of retail data processing, testified that she compared the Great Plains software with the PSI source code DIB had been using, and placed the Great Plains software in a file cabinet. DIB continued using the software furnished by PSI. (Wygant Dep., PSI Exhibit L, at 23:8-25:17.) In February 2001, DIB advised PSI it would no longer provide a royalty report reflecting its sublicensing of software because "we are no longer buying product from you." (Gibson e-mail message, 2/8/02, PSI Exhibit PPP.)

In a certified mail letter of February 14, 2001, PSI declared DIB in default under the January 19, 1989 Dealer License and terminated its relationship with DIB based on DIB's failure to report sublicenses and failure to pay royalties. (Miller Letter, 2/14/01, PSI Exhibit J.) On May 14, 2001, Great Plains terminated the licensing agreement that its predecessor, RealWorld, had entered into with PSI. (Schafer Letter, 5/14/01, PSI Exhibit LLLL.) Great Plains sent a copy of the termination of letter to DIB, whose general counsel, Thomas Burroughs, commented that "[p]erhaps, termination of the relationship will cause" PSI, which Burroughs characterized as "totally unrealistic and unreasonable" to "have a change of heart," (presumably concerning PSI's demand for royalties from DIB). (Burroughs e-mail message, PSI Exhibit NNNN.)

On October 4, 2001, DIB filed this lawsuit seeking a declaratory judgment that it is not in breach of any legal obligations to PSI. DIB now seeks summary judgment on several of PSI's counterclaims. In this opinion, the court addresses DIB's motion for summary judgment on PSI's

copyright infringement, breach of contract, and trade secret infringement claims, as well as DIB's motion for partial summary judgment on damages issues.

## DISCUSSION

### I. Copyright Infringement

In Count VII of its Third Amended Counterclaim, PSI alleges that, since February 14, 2001, DIB has made, used and distributed PSI's copyrighted software without PSI's consent and is therefore guilty of copyright infringement. The Copyright Act of 1976 protects original works of authorship fixed in a tangible medium of expression. 17 U.S.C. § 102(a). The protection extends to a broad array of subject matter including pictorial, graphic, sculptural and literary works, 17 U.S.C. § 102(a)(1), which includes computer programs. *qad. inc. v. ALN Associates, Inc.*, 974 F.2d 834, 835 (7th Cir. 1992).

DIB seeks summary judgment on PSI's copyright infringement claim for three reasons: First, that DIB enjoys an "irrevocable implied license" to use PSI's software; second, that DIB is a joint author of the software; and third, that PSI is guilty of misuse of its registrations. (DIB's Memorandum of Law in Support of Its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 1.) The court considers those arguments in turn.[1]

---

[1] In a 27-page response brief, PSI responded to each of the three arguments. DIB's Reply Memorandum nevertheless shrilly asserts that PSI "waived any argument" challenging DIB's purported defense that the source code at issue here is not copyrightable. Having again reviewed DIB's opening memorandum, the court finds no reference there to an argument that the PSI source code is not original. As noted, the opening memorandum presented arguments of implied license, joint authorship, and misuse of registrations, and did not explicitly challenge the originality of PSI's work. The court concludes that PSI did not waive the matter by failing to respond to an argument not made in DIB's opening brief. On receipt of DIB's reply memorandum, PSI filed a motion seeking leave to file a supplemental pleading on the issue of copyrightability, should the court reach that issue. As the court determines DIB did not properly present it, PSI's Motion to File Adjunct

## A.     Irrevocable Implied License

DIB argues, first, that PSI granted it an implied license to use source code, including source code in Passport's copyright registrations, with its member stores. The Seventh Circuit has recognized that a nonexclusive license may be granted orally, or may even be implied from conduct. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). The existence of an implied license is an affirmative defense to a claim of copyright infringement. *Id.* DIB bears the burden of proving the existence of an implied license. *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 40 (1st Cir. 2003). To do so, DIB must show that (1) DIB requested creation of the work; (2) PSI created it and delivered it to DIB; and (3) PSI intended that DIB copy and distribute the work. *Kennedy v. National Juvenile Detention Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999); *see also Shaver*, 74 F.3d at 776.

Of these factors, the first two are essentially undisputed. PSI created and modified the custom software and provided it to DIB. PSI urges, however, that there is no evidence that PSI intended for DIB to use the source code outside the parameters of the parties' written agreement. Indeed, PSI contends, the existence of an express license agreement precludes proof of any implied license. *See Slamecka v. Empire Kosher Poultry, Inc.*, 290 F. Supp. 2d 934, 939 (N.D. Ill. 2003) (quoting other case law for the proposition that an "implied in fact contract will not be recognized if there is an express contract between the parties concerning the same subject on which the implied contract claim rests"); *Mahurkar v. C.R. Bard, Inc.*, No. 92 C 4803, 1993 WL 259446 at *10 n.4 (N.D. Ill. July 6, 2003) (recognizing this principle in a patent license dispute).

---

Pleading Relating to the Copyrightability of its Software (Doc. No. 266) will be denied as moot.

There is ample evidence in the record that DIB officers believed that DIB's rights to use the software at issue here derived from written agreements. It is undisputed that the parties entered into an express license agreement, the Dealer License, in 1994, with a five-year renewable term. In its answer to the Third Amended Counterclaim, DIB admitted that it executed the Agreement dated January 19, 1989. (Answer, PSI Exhibit C, ¶ 20.) By its terms, the Dealer License covered source code bearing PSI's proprietary notice (and that of Real World, the originator of the software), as well as "any subsequent corrections, enhancements or modifications to the items which Licensor may furnish to Licensee during the terms of this License." (Dealer License, PSI Exhibit I, ¶ 1.3.) The Dealer License provided that PSI and Real World retained all copyright, trade secrets and other proprietary rights in the software. (Id. ¶ 3.2.) The Dealer License anticipated the payment of fees by DIB for a "non-exclusive license to use . . . the RealWorld proprietary computer software items" and included a schedule of additional fees to be paid for distribution of the software to additional parties. (Id. page 1; Royalty Schedule A.)

The License was scheduled to expire in 1994, but there is evidence that through Gary Zoller, its manager of retail data services, DIB agreed to continue operating under the terms of the Dealer License, at least until 1999. (Zoller Dep., PSI Exhibit O, at 18.) In two 1999 letters, John Snider, DIB's Vice President of Information Technology, referred to the "ten-year anniversary of the Dealer License" for the software. (Snider Letters, PSI Exhibits P, TT.) In a letter to Great Plains dated February 15, 2001, DIB's general counsel Thomas Burroughs stated his belief that the License had expired in 1999. (Burroughs Letter, PSI Exhibit Q.) Further, in hundreds of agreements that DIB made with its member stores from 1989 through 2000, DIB acknowledged that it was granting sublicenses "pursuant to a license agreement we have with Passport Software, Inc." and that "[a]ll

copyright and other proprietary rights in portions of the Software enhanced by PSI or [DIB] are and remain the valuable property of the respective companies." (Appendix 2 to representative contracts dated 1989 through 2000, PSI Exhibits BB through LL.)

This court agrees with PSI that the parties' execution of the Dealer License, and DIB's explicit acknowledgment and adherence to its terms, are inconsistent with an implied license arising from the parties' conduct. The fact that DIB approached PSI in August or September 2000 seeking to purchase unlimited rights in the software is powerful evidence that DIB did not at that time believe it already possessed such rights. Notably, in its Third Amended Complaint, PSI alleges that DIB's unauthorized use of the copyrighted software began on February 14, 2001. On that date, PSI sent DIB a notice of default, demanding that DIB pay fees and charges and royalties PSI claimed were due under the Dealer License. (Notice of Default, PSI Exhibit J.) In determining whether an implied license exists, the court must consider objective evidence of the parties' intent. *Meisner Brem Corp. v. Mitchell,* 313 F. Supp. 2d 13, 16 (D.N.H. 2004), citing *Danielson,* 322 F.3d at 42. The February 14, 2001 letter constitutes a clear indication that at least as of that date, PSI had no intention to permit DIB's continued use of the software. At a minimum, the court concludes there are disputes of fact on the issue of whether PSI delivered software to DIB with the intent that DIB could continue using and distributing that software, without payment of royalties, after the termination of their agreement.

As noted earlier, PSI not only opposes DIB's motion for summary judgment on the copyright infringement issue, but has filed its own motion for summary judgment on Count VII. Where parties file cross-motions for summary judgment, the court is required to adopt a "Janus-like perspective," viewing the facts for purposes of each motion through the lens most favorable to the non-moving

9

party. *See Granzow v. Eagle Food Centers, Inc.,* 27 F. Supp. 2d 1105, 1106 (N.D. Ill. 1998). This approach sometimes requires denial of both motions. *Id.* Based on the evidence described above, a jury could find that DIB understood that it was bound by the terms of the Dealer License, at least through January 1999, and that PSI did not intend to permit DIB's use of the copyrighted work under any implied license prior to that date.

The court is far less certain of PSI's intentions after that date. PSI knew or should have known that by its terms, the Dealer License expired at the latest by January 1999, but PSI has offered no explanation for its failure to take steps to renegotiate the license or retrieve its copyrighted software from DIB at that time. Indeed, PSI apparently made no effort to enforce the requirements for renewal even in 1994 but continued performing programming on the software to meet DIB's needs. John Snider of DIB has testified that as of January 1999, he was "confused whether the dealer license was in effect technically." (Snider Dep., DIB Ex. 41, at 37:12-13.) John Miller, PSI's President, has asserted that "PSI operated under the terms of the Dealer License from 1989 through March 2001," (Miller Aff. ¶ 67), but PSI has not offered evidence that DIB officials understood that the Dealer License itself – as opposed to other individual licenses or agreements or oral commitments – continued in force. Nor has PSI explained how it was that PSI was unaware that "DIB had not been complying with all of the provisions of the Dealer License" before PSI "discovered" this fact in "mid to late 2000." (*Id.* ¶ 68.) *Cf. Viacom Int'l Inc. v. Fanzine Int'l Inc.,* No. 98 CIV. 7448, 2000 WL 1854903 at *5 (S.D.N.Y. July 12, 2000) ("[F]ailure by the copyright owner to object to reproduction of copyrighted works may provide the basis for implying a nonexclusive license, but this basis for an implied license is available only when the owner's silence is coupled with knowledge of the copying.") As DIB points out, PSI officials acknowledged that PSI prepared and provided custom programming,

10

including software designed to address "Y2K" problems, for distribution by DIB to its members. (DIB Reply Memorandum in Support of its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 8-9, citing deposition transcripts of John and Muriel Miller.) The court does not agree with DIB that the fact that it paid PSI for this programming requires the conclusion that an implied license arose; PSI might well have intended for the custom programming to be covered by the terms of the Dealer License or by other writings. Because PSI apparently did not arrange for a renewal of that written agreement, however, a reasonable trier of fact might conclude that it intended for DIB to distribute the work pursuant to an implied license after January 1999.

Viewing the evidence in the light most favorable to each side on the other's motion, the court concludes there are disputes of fact concerning the existence of an implied license after January 1999.

### B.     Joint Authorship

In the alternative to its implied license argument, DIB contends that it is a joint author of PSI's copyrighted software. Both parties agree concerning the relevant legal standards. To qualify as a joint author, DIB must show (1) that the parties intended to be joint authors at the time the work was created and (2) that each author's contribution to the work is independently copyrightable. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068-71 (7th Cir. 1994); *see also* 17 U.S.C. § 101. The court need not address the second prong of this test because it concludes that there are disputes of material fact concerning the first prong.

The language of a written agreement between the parties can constitute evidence of their intentions concerning co-authorship. *Thomson v. Larson*, 147 F.3d 195, 204 (2d Cir. 1998). As described in part above, the terms of the Dealer License are plainly at odds with DIB's contention that both parties intended for DIB to be a co-author of the software. Paragraph 3.2 of the Dealer

11

License notes that the "Licensed Software embodies substantial creative efforts of both RealWorld and PSI," but makes no mention of any contribution on the part of DIB. (Dealer License, PSI Exhibit I, at 3.2.) In that same paragraph, the agreement provides that "[a]ll copyright . . . and other intellectual and proprietary rights in the Licensed Software are and remain the valuable property of RealWorld and PSI . . . ." (Id.) Paragraph 1.3 of the agreement explains that the copyrighted software, referred to at this point as "Sublicensed Software" includes not only the source code originally delivered to DIB in 1989, but also "any subsequent corrections, enhancements of modifications to the items . . . ." (Id. ¶ 1.3(d).) DIB was entitled, under the language of the Dealer License, to "modify and enhance the Licensed Software," but the use of such software "whether modified or enhanced . . . shall remain subject to all of the terms and conditions of this Agreement." (Id. ¶¶ 6.1, 6.2.)

In addition, the language of agreements between DIB and hundreds of its member stores for use of the software is inconsistent with its claim of joint authorship. Cf. Erickson, 13 F.3d at 1072 (noting that licensing agreement between copyright holder and a third party undermined plaintiff's claim of joint authorship). In an appendix to its form agreement, DIB warned its member stores that copyrights in the software "are and remain the valuable property of [RealWorld Corporation]." (E.g., Appendix 2 to Computer Software License Agreement between DIB and Wannemakers, PSI Exhibit CC.) DIB explicitly asserted that it acted as an "independent contractor" with respect to PSI and was "not PSI's nor RWC's agent, partner, franchisee, joint venturer or employee." (Id.)

Joint authorship is an affirmative defense to a claim of copyright infringement. SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 314 (S.D.N.Y. 2000). The court concludes DIB has not met its burden of establishing that there are no disputes of fact on this matter.

12

## C.    Misuse

Finally, DIB intends that PSI has misused its copyright registrations by seeking to extend its copyright protection over software to which it has no rights. As it does with respect to the issues of implied license and joint authorship, DIB bears the burden of proof on this matter.

The defense of copyright misuse "bars a culpable plaintiff from prevailing on an action for the infringement of the misused copyright." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990). The defense recognizes that "copyright law [seeks] to increase the store of human knowledge and arts by awarding . . . authors with the exclusive rights to their works for a limited time . . . [but] the granted monopoly power does not extend to property not covered by the . . . copyright." *Id.* at 976. As the Ninth Circuit observed in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001), most of the cases that recognize this defense "involve unduly restrictive licensing schemes." Indeed, in the Seventh Circuit, copyright misuse is ordinarily analyzed under conventional antitrust principles. *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 512 (7th Cir. 1982); *see Data General Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186 n. 63 (1st Cir. 1994); *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1201 (Fed. Cir. 2004) ("Because nothing in Seventh Circuit law contradicts *Data General*, we similarly conclude that it is the standard that the Seventh Circuit would most likely follow.") As the Supreme Court has stated: "The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n.29, (1992) (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)).

13

DIB here does not credibly assert that PSI is guilty of using its copyright to restrain DIB's use of non-copyrighted material, or of other anticompetitive conduct. Instead, DIB appears to suggest that PSI's copyright registrations contained intentional misrepresentations in that they failed to identify other authors of the source code Passport was seeking to register.[2] DIB urges that Passport has no right to charge DIB with infringing source code that RealWorld or DIB itself authored.

As this court understands PSI's claims, however, PSI is not seeking to bar DIB from using source code which DIB authored. Nor is the court persuaded that there are no disputes of fact concerning DIB's copyright misuse defense. The case on which DIB chiefly relies, *qad. inc. v. ALN Assocs., Inc.*, 770 F. Supp. 1261 (N.D. Ill. 1991), *aff'd*, 974 F.2d 834 (7th Cir. 1992), is instructive but distinguishable. In *qad*, the district court initially granted plaintiff's motion to preliminarily enjoin a competitor's use of the plaintiff's copyrighted software program. Later, the court granted summary judgment in favor of the defendant competitor after it concluded that plaintiff's witnesses had made misrepresentations at the preliminary injunction hearing: specifically, they falsely claimed the software at issue was a completely original work, of which plaintiff wrote "every line . . . from scratch," and that defendant could only have obtained the code by direct copying of that original work. 770 F. Supp. at 1267. Instead, the court concluded, plaintiff qad had "copied much of the selection, order, arrangement and definitions of fields" from software developed by a third party, but

---

[2]    DIB points out that intentional misrepresentations can invalidate a copyright registration. (DIB's Reply Memorandum in Support of its Motion for Summary Judgment on PSI's Copyright Infringement Claim, at 16.) The court does not understand DIB to be arguing that the court should find PSI's copyrights invalid, however. In any event, a finding of misuse does not ordinarily invalidate a copyright. *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 793 n.81 (5th Cir. 1999), citing *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990).

failed to identify its own software as a derivative work, or to acknowledge that defendant itself could have obtained the code from the third party source. *Id.* at 1263.

DIB has identified no similar misrepresentations on the part of PSI. In its own copyright applications, PSI clearly indicated that it was seeking registration of a derivative work and identified RealWorld software as the work from which PSI's own code was derived. (Copyright Registration, PSI Exhibit F.) PSI notes, further, that PSI's agreement with RealWorld authorized PSI to "modify and enhance the Licensed Software," combine it with other software, convert it for use in another programming language, or otherwise create derivative works. (Master Distributor Agreement for RealWorld Software, PSI Exhibit G, ¶ 12.1.) Federal regulations permit the depositing of "identifying portions," rather than copies, of computer programs for which copyright protection is sought, 37 C.F.R. § 202.20(c)(2)(vii)(A), and case law recognizes that a copyright may cover a program that includes previously known source code. *Computer Assocs. Int'l v. Quest Software, Inc.,* 333 F. Supp. 2d 688, 697 (N.D. Ill. 2004) (Moran, J.) *See also Harris Custom Builders, Inc. v. Hoffmeyer,* 834 F. Supp. 256, 260 (N.D. Ill. 1993) (distinguishing *qad.* on the basis that plaintiff there had not disclosed a prior work in its copyright application).

DIB makes much of the fact that PSI's copyright registrations "incorporate source code that was written by Passport, Do It Best, and RealWorld." (DIB's Memorandum of Law in Support of Its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 16.) As noted earlier, however, under the terms of the 1994 License Agreement, DIB had rights to modify or enhance the software provided by PSI, but PSI and RealWorld retained copyrights in that enhanced software. RealWorld might have some basis to complain about PSI's copyright claims, but the court

concludes that DIB is not entitled to summary judgment on the basis of the purported misuse defense.

## II.    Breach of Contract

In Count I, PSI charges DIB with breach of contract. PSI's theory is that the Dealer License that the parties entered into in 1989 continued until March 2001, 30 days after PSI issued a notice of termination. The language of the Dealer License itself is inconsistent with this theory. It provides:

> This license shall be in effect . . . and shall be valid until termination as provided below, or until a point in time five years hence, whichever occurs first. . . . [Y]ou [DIB] may renew this Agreement at the end of the five year term for an additional five year term provided you pay the then current renewal fee and sign the then current Renewal Source Code License Agreement.

(Dealer License, PSI Exhibit I, ¶ 9.1.) Further, the Dealer License prohibits any modification that is not "in writing and signed by the party against whom such is sought to be enforced." (*Id.* ¶ 10.9.) It is undisputed that DIB never paid a renewal fee, nor did DIB sign an agreement to extend or modify the 1989 Dealer License. (Miller Dep., DIB Exhibit 3, at 101:11-20, 264:5-10.) DIB argues that these undisputed facts require judgment in its favor on PSI's breach of contract claim. In assessing this motion, the court considers whether there are disputes of fact concerning an alleged oral extension of the Dealer Agreement, and whether enforcement of such an oral agreement is barred by the statute of frauds.

### A.    Alleged Oral Extension

PSI urges that the absence of a signed extension agreement is not fatal here. Illinois law permits the parties to a written contract to alter or modify its terms by a subsequent oral agreement even where the terms of the contract appear to preclude such a modification. *Tadros v. Kuzmak*, 277 Ill. App.3d 301, 312, 660 N.E.2d 162, 170 (1st Dist. 1995) (collecting cases). Where, as here, a

written contract contains a provision banning oral modifications, a party seeking to establish that such a provision is waived must offer clear and convincing evidence of such a waiver. *See Czapla v. Commerz Futures, LLC,* 114 F. Supp.2d 715, 718 (N.D. Ill. 2000) (citing *Roboserve, Inc. v. Kato Kagaku Co.,* 78 F.3d 266, 277 (7th Cir.1996).

In support of its argument that an oral agreement existed, PSI relies heavily on the testimony of Gary Zoller, who in 1994 served as manager of retail data services for DIB. Zoller testified that DIB continued to operate under the agreement after 1994. (Zoller Dep., PSI Exhibit O, at 18:8-9.) According to Zoller, "We had conversations with Passport, John Miller [PSI's President], and we were assured we could continue to resell the product under the license agreement." (*Id.* at 20:15-19.) Further, as described above, in two letters he wrote in 1999, DIB's Vice President, John Snider, referred to the "ten-year anniversary of the Dealer License" for the software. (Snider Letters, PSI Exhibits P, TT.) In addition, in February 2001, DIB's general counsel, Thomas Burroughs, expressed his belief that the License had expired in 1999, not in 1994. (Burroughs Letter, PSI Exhibit Q.) PSI notes, as well, the references to a "license agreement we have with Passport Software," that appear in DIB licenses with its member stores continuing into the year 2000. (Appendix 2 to representative contracts dated 1989 through 2000, PSI Exhibits BB through LL.)

As DIB emphasizes, however, there is substantial evidence that casts doubt on the assertion that the parties understood their relationship was governed by the Dealer License. For example, the parties entered into written agreements for custom programming of the software at issue here without making any mention of the Dealer License. A May 11, 1994 document, signed by Gary Zoller and John Miller, is characterized as a "working agreement between [DIB and PSI] covering the development of three software products for [DIB] by Passport Software." (5/11/94 agreement, DIB

Exhibit 37.) No mention of the Dealer License, or of any contractual relationship, appears within that document. A March 24, 1994 letter from Paul Erbe of PSI "confirm[s] [PSI's] arrangements to assist [DIB] with the further development and support" of its retailing software and explains "our [PSI's] policy to bill clients monthly for costs incurred plus out-of-pocket expenses." It makes no reference to the Dealer License or to any royalties owing under that license. (Erbe letter 3/24/94, DIB Exhibit 38.) An August 1, 2000 letter from Muriel Spencer of PSI to Chuck Thatcher of DIB expresses PSI's anticipation of "rekindling a productive working relationship," proposes the development of a new computer module, and sets out a pricing table for purchases of the module over a five-year period, again without any reference to the parties' Dealer License or to any existing contractual relationship. (Spencer letter 8/1/00, DIB Exhibit 39.)

### B. Statute of Frauds

Even if the court recognizes Mr. Zoller's communications as sufficient to create a dispute of fact concerning an oral extension agreement, DIB argues that the statute of frauds bars the enforcement of such an agreement. The Illinois statute of frauds precludes enforcement of oral contracts that cannot be performed within a year of their making. 740 ILCS 80/1; *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 489, 680 N.E.2d 1347, 1351 (1997). The statute applies in cases like this one, involving a purported oral extension of a written contract which cannot be performed within one year.[3] *Dickens v. Quincy College Corp.*, 245 Ill. App. 3d 1055, 1059, 615 N.E.2d 381, 384 (4th Dist. 1993). As the *McInerney* court explained:

---

[3]     PSI does not argue that the alleged oral extension of the Dealer License is not of this nature.

The period of one year, although arbitrary, recognizes that with the passage of time evidence becomes stale and memories fade. The statute proceeds from the legislature's sound conclusion that while the technical elements of a contract may exist, certain contracts should not be enforced absent a writing. It functions more as an evidentiary safeguard than as a substantive rule of contract. As such, the statute exists to protect not just the parties to a contract, but also--perhaps more importantly--to protect the fact finder from charlatans, perjurers and the problems of proof accompanying oral contracts.

*Id.* at 489, 680 N.E.2d at 1351.

There is no suggestion here that PSI, or any of its witnesses, are "charlatans or perjurers." But this case presents obvious problems of proof. DIB insists there was no continuing obligation under the License Agreement and that it agreed, instead, to make individual purchases of custom programming and licensing on a project-by-project basis. PSI insists the Dealer License continued to control the parties' relationship, but offers no evidence of the precise terms of that agreement, nor any explanation for its failure ever to collect royalty fees from DIB, to insist that DIB sign a renewal agreement, or even to make reference to the License Agreement in its correspondence with DIB.[4] As another judge of this court has observed, "While the plaintiff might have been comfortable with proceeding somewhat informally in its dealings with defendant, it cannot later expect the court to complete the negotiation process and arrive at terms on its behalf." *Doyle's Const. & Remodeling, Inc.*

---

[4]     DIB notes, further, that as Gary Zoller explained, PSI always used DIB's then-current software when it worked on any new programming and was therefore always aware of the source code DIB was using and sublicensing to its members.     (DIB's Memorandum of Law in Support of its Motion for Summary Judgment on Passport's Breach of Contract Claim, at 11-12, citing Zoller Dep., DIB Exhibit 19, at 41:25-42:10.) Yet until 2001, PSI never suggested that DIB was in breach of any agreement between the parties. The court is uncertain how was that PSI did not, prior to September 2000, discover DIB's alleged misuse of its code, but concludes that disputes of fact preclude summary judgment on DIB's laches defense.

*v. Wendy's Int'l, Inc*, 144 F. Supp. 2d 969, 975 (N.D. Ill. 2001), citing *J.F. McKinney & Assocs. v. General Electric Inv.* Corp., 183 F.3d 619, 622 (7th Cir. 1999).

PSI urges that certain exceptions to the statute of frauds are available here. First, PSI notes the letters written by John Snider of DIB in January and March 1999 in which he refers to the "ten year anniversary" of the Dealer License. Snider's January letter refers to the possibility that the parties' relationship might "need[] to be modified," and his March letter opines that the parties ought not "be limited by the historical agreement." In a letter written on February 15, 2001, the day after PSI notified DIB of default, General Counsel Thomas Burroughs advised RealWorld's successor of his "belief that the agreement expired by its own terms in 1999." PSI correctly observes that the writing necessary to satisfy the statute of frauds need not be a single document, *Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir. 1992), and need not be " 'in and of itself the contract in question . . . *so long as the intention of the parties can be established.*' " *Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 929 (7th Cir. 1991) (quoting *Yorkville Nat'l Bank v. Schaefer*, 71 Ill. App. 3d 137, 140, 388 N.E.2d 1312, 1315 (2d Dist. 1979)). PSI recognizes that the documents on which it relies to satisfy the statute of frauds must enable the court to determine all the terms of the bargain. (Passport Software Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Breach of Contract Claim, at 6.)

In the court's view, the Snider and Burroughs letters do not meet that test. Mr. Snider's letters are ambiguous; although he refers to the "anniversary" of the Dealer License, he does not acknowledge explicitly that its terms continued to govern the parties' dealings; in fact, his March letter refers to the agreement as "historical." Mr. Burroughs's 2001 letter to Great Plains observes that the Dealer License "had a five year initial term, and was subject to one renewal term of five

20

years," supporting Burroughs's belief that the agreement had expired in 1999. Contrary to PSI's characterization of this letter as one that "confirms the existence of the oral contract," (*id.* at 8), this letter refers only to the parties' written agreement. At best, Burroughs's letter could constitute an admission that the Dealer License continued in force until 1999; it does not support PSI's contention that the License continued indefinitely.

The court turns, then, to PSI's remaining arguments: that compliance with the statute of frauds is excused under the doctrines of part performance or full performance. Under the full performance doctrine, an oral agreement may be enforced according to its terms if it has been fully performed by the party seeking enforcement. *Strzelecki v. Schwarz Paper Co.*, 824 F. Supp. 821, 825 (N.D. Ill. 1993), citing *Meyer v. Logue*, 100 Ill. App. 3d 1039, 1043-44, 427 N.E.2d 1253, 1256 (1st Dist. 1981). Full performance renders the statute of frauds inapplicable because it "constitutes strong evidence that a contract existed." *Greenberger, Krauss & Tenenbaum v. Catalfo*, 293 Ill. App. 3d 88, 96, 687 N.E.2d 153,159 (1st Dist. 1997), citing *Meyer*, 100 Ill. App.3d at 1043-44, 427 N.E.2d at 1256. Partial performance is another basis for an exception to the statute of frauds. The doctrine of partial performance is "rooted in the equitable concept of reliance," *Dickens*, 245 Ill.App.3d at 1061, 615 N.E.2d at 385, and applies "to cases where there [have] been such acts of performance by the party" so that it "cannot be restored to [its] original position." *Gibbons v. Stillwell*, 149 Ill. App. 3d 411, 415-16, 500 N.E.2d 965, 969 (5th Dist. 1986).

PSI has not been specific about precisely what activities constitute "performance" for this purpose. Presumably PSI includes its own failure to prohibit DIB from continuing to use its software or to notify DIB that the Dealer License was terminated; but the court is unwilling to characterize PSI's silence and failure to act as "performance" that binds DIB to the terms of an agreement. PSI

21

also performed additional programming and software development in the years after 1994. DIB insists PSI did this work pursuant to additional individual agreements and that DIB paid PSI on a project-by-project basis for this additional work. Although PSI contends that all of the additional programming was a function of the Dealer License, its witnesses acknowledged that DIB paid it for all of that additional programming (John Miller Dep., DIB Exhibit 3, at 174:9-176.23; Muriel Miller Dep., DIB Exhibit 13, at 79:14-80.15; 84:4-86:10), and there is no evidence that the programming work itself constituted evidence of the continuing existence of the Dealer License. PSI points out that it continued to assign serial numbers for DIB's member stores, but there is no evidence that PSI attempted to collect license fees or royalties on these sublicenses. Thus, in the court's view, PSI's purported "full performance" does not constitute evidence that the Dealer License Agreement continued in effect after 1999.

To the extent PSI invokes the "partial performance" doctrine as a basis for an exception to the requirement of a writing, the court notes that this doctrine supports only equitable relief and is inapplicable where, as here, the party asserting the existence of a contract seeks money damages. *Trustmark Ins. Co. v. General Cologne Life Re Ins. Co. of Am.*, No. 00 C 1926, 2004 WL 1745777 (N.D. Ill. Aug. 2, 2004), citing *Payne v. Mill Race Inn*, 152 Ill. App. 3d 269, 278, 504 N.E.2d 193, 199-200 (2d Dist. 1987) (doctrine of partial performance applies only where "it is impossible or impractical to . . . compensate the performing party for what he has parted with, or for the value of his performance"); *Gibbons*, 149 Ill. App. 3d at 416, 500 N.E.2d at 969 (refusing to apply doctrine of part performance where "the plaintiff had an adequate remedy at law for damages"); *Cherry Payment Sys., Inc. v. Rogers*, No. 92 C 5918, 1995 WL 584062, at *3 (N.D. Ill. Oct. 3, 1995) (noting that under Illinois law, "the availability of damages to compensate [the performing party] . . . will

22

ordinarily preclude reliance on the equitable doctrine of partial performance."). As this court understands the claims, PSI seeks monetary damages for DIB's alleged breach of contract. The part performance doctrine is not applicable in this context.

DIB's motion for summary judgment on PSI's breach of contract claim is denied with respect to the period until January 1999, and otherwise granted.

## III. Trade Secret Misappropriation

Computer software may constitute trade secrets and may be entitled to trade secret protection where the owner has taken appropriate steps to protect the secrecy of the information. *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 695 (N.D. Ill. 2004); *see CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337 (M.D. Ga. 1992); *Liberty American Ins. Group, Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271 (M.D. Fla. 2001); *Electronic Data Systems Corp. v. Heinemann*, 493 S.E.2d 132 (Ga. 1997). DIB's sole argument for summary judgment in its favor on this claim is PSI's purported failure to identify its trade secrets with the appropriate degree of specificity. In *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir. 2002), a provider of medical business management software attempted to enforce trade secret rights against a competitor and former customer, identifying, as its trade secret, " 'a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package'." *Id.* at 583. Affirming summary judgment in favor of defendants on this claim, the Seventh Circuit had little difficulty concluding that this broad description is not nearly specific enough to qualify for trade secret protection under Wisconsin law.

DIB contends PSI's description of its trade secret is similarly overbroad. In response to DIB's initial interrogatories on this matter, PSI claimed its trade secrets are "the processes and

23

methodologies encompassed in" forty features of the licensed software. (Answers to Interrogatories, DIB Exhibit 10, at 4.) In a supplemental answer, PSI reduced the features in which it claimed trade secret protection from 40 to 28 (Supplemental Interrogatory Answer, DIB Exhibit 11) but furnished, in addition, 831 pages of source code which it contends is protected material. According to DIB, these 831 pages "include every line of code in Do It Best's CS2000 system ever authored by Passport, without regard to the value or secrecy of any of the lines of code." (DIB's Memorandum of Law in Support of Summary Judgment on Passport's Trade Secret Misappropriation Claim, at 5.) Indeed, John Miller, President of PSI and PSI's designated Rule 30(b)(6) witness on this issue, acknowledged that "most, if not all" of the projects that Passport worked on for Do It Best are, in PSI's view, trade secrets. (Miller Dep., DIB Exhibit 3, at 198:14-22.) Even more broadly, Mr. Miller testified that PSI's trade secrets include "the design, the structure, the programming methods, and the integration of that code within the body of code, so it's the way in which we solved business problems." (Id. at 196:16-20.)

DIB urges that this description is simply too broad to support trade secret protection under the Seventh Circuit's standards. For example, in the *IDX Systems* case, where the plaintiff claimed a 43-page document describing the "methods and processes underlying" its software was a sufficiently specific description, the court responded:

> No, it isn't. These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets.

24

*Id.* at 583-84. In *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992), plaintiff claimed that certain manufacturing techniques were trade secrets. Reversing a jury verdict against individuals who had been employed by plaintiff's material supplier, the court explained that plaintiff had identified no commercially valuable adaptations of the well known manufacturing techniques and was not entitled to trade dress protection for those techniques. *Id.* at 1266. As the *IDX Systems* court explained, *Composite Marine* stands for the proposition that a plaintiff seeking trade dress protection "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." 285 F.3d at 584, citing *Composite Marine*, 962 F.2d at 1266.

Passport's submissions come dangerously close to doing exactly that. In its response to DIB's motion for summary judgment on this claim, PSI instructs that "to determine PSI's trade secret, [DIB] need merely look at the lines of code which PSI identified and *examine the design, structure, and programming techniques and the integration* into the code which DIB is using . . . ." (Passport Software, Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Trade Secret Misappropriation Claim, at 10.) Passport correctly notes language in *Thermodyne Food Service Prods., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1305 (N.D. Ill. 1996) that recognizes the possible trade secret status of "a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive advantage . . . ." The court there recognized a trade secret in the "interrelationship" of otherwise unprotectable component parts." *Id.* at 1305 n.5.

The court here harbors some doubt as to whether PSI's identification of every line of code it developed for DIB is sufficiently specific as a description of its trade secrets. The court does

recognize, however, that PSI's submissions differ from those criticized in some of the case law. PSI did identify specific lines of code and specific software features for which it claims protection. This differs markedly from *Lynchval Sys. Inc. v. Chicago Consulting Actuaries, Inc.*, No. 95 C 1490, 1998 WL 151814 (N.D. Ill. Mar. 27, 1998), which DIB argues supports its position here. In *Lynchval*, the plaintiff was unable to identify any "computer printouts, formulae, memoranda, or any other tangible technical data," identifying its trade secrets, nor to show "how, when and by whom" its purportedly protected programs were developed.

The court recognizes that DIB may have other objections to PSI's claim of trade secret protection for the software at issue in this case. Without more information (including, possibly, expert testimony concerning the nature of PSI's disclosure of code here), the court denies DIB's motion for judgment in its favor on the defense of lack of specificity.

## IV. Civil Conspiracy

Count VI of PSI's Third Amended Counterclaim charges DIB with civil conspiracy. Its allegations in support of that claim focus on DIB's conduct in interfering with PSI's relationship with Great Plains and PSI's rights to use the RealWorld software. In response to DIB's motion for summary judgment on this claim, PSI describes its theory differently:

> DIB and Great Plains, each for its own motive, knowingly and voluntarily participated in a common scheme to allow DIB to continue to use the software which PSI had delivered to DIB under the terms of the Dealer License and which each knew was an enhanced version of the RealWorld software which contained PSI's copyrighted code.

(Passport Software Inc.'s Memorandum of Law in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Civil Conspiracy Claim, at 1.) As thus constructed, DIB correctly characterizes PSI's claim as one of conspiracy to infringe. DIB argues in

26

its reply memorandum that such a claim is preempted, citing *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F. Supp. 2d 953 (N. D. Ill. 2002). Specifically, Judge Castillo observed there that a "cause of action for civil conspiracy exists only if one of the parties to the agreement commits a tort in furtherance of the agreement." *Id.* at 959, citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63, 645 N.E.2d 888, 894 (1994). The tort at issue in *Higher Gear* was a claim of tortious interference which was itself a claim that the defendant had created software that "closely functioned and resembled" and therefore infringed plaintiff's licensed software. *Id.* at 959. Like the tortious interference claim itself, Judge Castillo concluded that the plaintiff's civil conspiracy claim was preempted by federal copyright law.

The court concludes that PSI's civil conspiracy arguments rest on a "tort" of copyright infringement. As such, that claim appears to be preempted. Because DIB made this argument for the first time in its reply brief, however, the court recognizes that PSI is entitled to respond to this argument, if it wishes to do so. DIB's motion for summary judgment on the civil conspiracy claim is therefore granted without prejudice. PSI will be free to move for reconsideration if it wishes to submit argument on this issue only.

## V. Damages

Passport claims that it is entitled to a variety of damages in this case, including (1) maintenance fees that DIB collected for providing technical support to its members; (2) damages incurred from the date the parties' relationship began in January 1989 through March 2004; and (3) statutory damages and attorneys' fees under the Federal Copyright Act. 17 U.S.C. § 412. DIB argues that under the express terms of the Dealer License, Passport is not entitled to any maintenance fees. DIB also argues that Passport cannot recover damages incurred prior to 2001, the

year in which DIB's wrongful conduct allegedly began. Finally, DIB claims that statutory damages are unavailable under the Copyright Act because the alleged infringement commenced before Passport registered its copyright.

## A.     Maintenance Fees

Passport's damages expert, Darren Guccione, submitted an expert report stating that Passport is entitled to "monthly maintenance charge[s] of $200 per store that was to be earned by Passport as the new licensor and service provider for DIB's member-stores." Guccione also included revenues DIB generated from maintenance fees in his unjust enrichment analysis. DIB argues that this analysis is flawed because none of DIB's members had an obligation to seek monthly maintenance from Passport either before or after the relationship between Passport and DIB ended. (Do It Best's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Damages (hereinafter "DIB Damages Mem."), at 6.) DIB first points to paragraph 9.6 of the Dealer License, which expressly provides that DIB could continue to support its members after the License expired:

> Upon termination of this License by expiration of its terms or pursuant to paragraph 9.2, [Do It Best] may apply in writing to [Passport] for permission to retain one copy of the Licensed Software for the sole purpose of supporting [Do It Best's] sublicensees. Upon termination of this License pursuant to paragraph 9.4, [Do It Best] may apply in writing directly to RealWorld for permission to retain one copy of the Licensed Software for the sole purpose of supporting [Do It Best's] sublicensees.

(Dealer License ¶ 9.6.) In addition, Passport's President, John Miller, admitted in his deposition that sublicensees were not obligated to use Passport for support. (Miller Dep., at 239.) Passport advances several theories to demonstrate that it is entitled to maintenance fees, none of which is persuasive.

28

## 1.    Recovery Under the Copyright Act

Passport first suggests that DIB's revenues from the maintenance fees somehow derived from its infringing activities and are thus a compensable component of damages arising from DIB's copyright infringement.  (PSI Damages Resp., at 2.)[5]  "Copyright law allows a copyright owner to recover his actual damages and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." *Ocean Atlantic Woodland Corp. v. DRH Cambridge Homes, Inc.*, 262 F. Supp. 2d 923, 927 (N.D. Ill. 2003) (citing 17 U.S.C. § 504(b)). A copyright owner's right to recover an accused infringer's profits is "limited to profits flowing from the infringing activities." *Id.* (citing *Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984)).

Passport claims that the maintenance fees constitute such recoverable profits because "the charges to members for support and maintenance [are] mandatory when a member purchases software," and because "the vast majority of all members continue to receive support and maintenance." (Pl. Damages Resp., at 4.) The problem with this argument is that under the Dealer License, DIB was entitled to maintenance fees under its own relationship with member stores, relationships that were expressly contemplated by the Dealer License.  In other words, the maintenance fees were not a product of allegedly infringing activities. *Ocean Atlantic Woodland*, 262 F. Supp. 2d at 927.

Also unpersuasive is Passport's assertion that DIB "profited from infringing PSI's copyrighted software including bundling it with other products and services including support and maintenance."

[5]    Passport Software, Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Partial Summary Judgment on Passport's Damage Claim is cited as "PSI Damages Resp., at __."

(Pl. Damages Resp., at 5-6.) Passport offers the analogy, drawn from *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923 (7th Cir. 2003), of a defendant that copyrights a book verbatim and then offers to give the book to customers for free as long as they pay $25 for a bookmark that cost the defendant 10 cents and has a fair market value of 50 cents. (*Id.* at 3) (citing *Bucklew*, 329 F.3d at 933.) As the *Bucklew* court explained, "[t]o hold in such a case that the defendant's profits from infringement were zero would approve a formula for evading copyright law." *Bucklew*, 329 F.3d at 933. In this case, conversely, there is no evidence that DIB set the maintenance fees artificially above the market rate in an effort to reallocate profits from infringing activity. Nor has Passport shown how the fees were "bundled" to any infringing activity such that DIB improperly profited from them. Indeed, as discussed above, Passport contends that DIB's furnishing of the software to its member stores was authorized until 2001 by the Dealer License. Under that theory, at least from 1989 through 2001, there was no infringing activity. Thus, Passport is not entitled to maintenance fees as a component of damages under the Copyright Act.

### 2. Recovery Under the Trade Secrets Act

Passport next argues that it is entitled to recover maintenance fees as a component of damages for DIB's trade secret misappropriation. Under the Illinois Trade Secrets Act ("ITSA"), damages may include "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4. Defendants may be liable under the Act "even if the defendants created a new product, if they could not have done so without use of the trade secret." *Hexagon Packaging Corp. v. Manny Gutterman & Assocs. Inc.*, 120 F. Supp. 2d 712 (N.D. Ill. 2000) (citing *Mangren Research and Dev. Corp. v. National Chemical Co.*, 87 F.3d 937, 944 (7th Cir. 1996)). Passport claims that "like

copyright infringement, [Passport] is entitled to unjust enrichment caused by DIB's misappropriation of [Passport's] trade secrets which had been delivered to DIB under the terms of the Dealer License." (Pl. Damages Resp., at 6-7.)

As with the copyright infringement theory of recovery, Passport has not shown how DIB's alleged misappropriation of trade secrets was related to its provision of maintenance services. Passport offers numerous facts that purportedly establish a violation of the ITSA, but there is nothing to tie that alleged violation to DIB's provision of maintenance services to its members. PSI does not suggest such services would not have been provided absent misuse of its trade secrets. Thus, the ITSA does not provide a basis for recovering maintenance fees.

### 3. Recovery Under the Lanham Act

Passport's attempt to recover maintenance fees under § 35 of the Lanham Act, 15 U.S.C. § 1117, also fails. Passport correctly notes that

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117. Aside from this quote, however, Passport offers only the conclusory assertion that "[s]ince support and maintenance fees were an element of DIB's profits, [Passport] is entitled under the Lanham Act to such fees considered as a part of its damage claim." (Pl. Damages Resp., at 19.) This is wholly insufficient to withstand summary judgment on this issue.

### 4. Recovery for Breach of Contract

As yet another theory in support of its claim for maintenance fees, PSI argues that this claim flows from DIB's breach of contract. Specifically, PSI contends that upon termination of the Dealer

31

License, PSI was entitled to step into DIB's shoes and would have the right to perform maintenance and service on the software for DIB's member stores. Passport cites paragraph 9.5 of the Dealer License, which provides:

> Upon termination of the Dealer License for any reason whatsoever, then: (b) for all Sublicensees [sic] issued hereunder by Dealer, such sublicensees shall be permitted the continued and uninterrupted use of the Object Code and User Manual(s) of the sublicensed items for the balance of the term of their Sublicenses provided that said sublicensees are not and will not be in default thereunder, and that all of Dealer's rights (but none of its obligations) relating to the Licensed Software under such sublicenses shall automatically be assigned to Licensor (or directly to Real World if Licensor's License has been terminated); . . . .

Dealer License ¶ 9.5. Passport claims that "[o]ne of the rights which DIB had relating to the Licensed Software was the right to receive maintenance and support payments from members," and that "DIB's right to receive these support and maintenance fees accrued to [Passport] upon termination of the parties' agreement." (Pl. Damages Resp., at 9-10.)

DIB's challenge to this theory focuses on the fact that the Dealer License itself does not mention DIB's provision of maintenance and service to its member stores.[6] Paragraph 9.5 does, however, anticipate that rights under the sublicenses with member stores would be assigned to PSI on termination, and the Support Services Agreement between DIB and its members calls for monthly payment for "support services" provided by DIB for its members' equipment. The court is uncertain whether this reference to payment for support services is what the parties understand as "maintenance fees." The court notes, further, that John Miller of DIB acknowledged in his

---

[6] DIB argues that Passport's reliance on paragraph 9.5 of the Dealer License is misplaced, but perhaps this is because both parties (apparently inadvertently) omitted certain language in that paragraph when they quoted it in their briefs. (See PSI's Response in Opposition to the Motion of Do It Best Corporation for Partial Summary Judgment on Passport's Damage Claim, at 9; Plaintiff's Reply in Support of its Motion for Summary Judgment on Damages, at 5.)

testimony that sublicensees would not have been obligated, on termination of the Dealer License, to rely on Passport for maintenance services. (Miller Dep., DIB Exhibit 3, at 239:12-15.) Further, although neither party has specifically explained the function and nature of maintenance fees, the court presumes they are payments for services actually rendered by DIB and did not constitute a disguised royalty payment. If the court is correct, then any amounts owed PSI under this theory would have to be offset by the expense and cost PSI would have incurred in providing the services themselves. Nevertheless, DIB has not argued that Passport's claim for maintenance fees for breach of contract is speculative; DIB objects that any such claim fails as a matter of law. The court overrules this objection without prejudice to other arguments DIB may make in response to this claim for damages. Its motion for summary judgment on this theory is denied.

## B. Pre-Breach/Pre-Violation Damages

Under any of the damages theories PSI has proffered, DIB argues, it is not entitled to recover damages for activity prior to the alleged breach of contract or other violation of PSI's rights. The court agrees. As reflected in PSI's answers to interrogatories, it claims that DIB's misappropriation of its trade secrets has occurred "[s]ince about March 14, 2001." (PSI's Supplemental Interrogatory Responses, PSI Exhibit TTT, at 14.) To the extent PSI now asserts it learned that DIB's trade secrets misappropriation began much earlier, that claim is inconsistent with its interrogatory responses and is therefore barred. Similarly, PSI acknowledged in its interrogatory answers that DIB was using PSI's copyrighted property with PSI's consent "[p]rior to February 14, 2001." (Id. at 17.)

In its opening memorandum on damages, DIB argued that, contrary to the opinion of PSI's expert witness, PSI is entitled to no lost profits under its breach of contract theory for any periods prior to the breach. (DIB's Memorandum of Law in Support of Its Motion for Partial Summary

Judgment on Damages, at 9.) Although the court recognizes that there are disputes concerning when, if at all, a contract breach occurred, PSI has not responded to this argument and, indeed, concedes that it is not seeking recovery for damages prior to any breach.

DIB's objection to recovery of amounts for pre-breach/pre-violation conduct is, therefore, sustained.

### C.    Statutory Damages

DIB claims that Passport is not entitled to statutory damages under the Copyright Act because DIB's alleged infringement commenced before Passport registered its copyright. Section 412 of the Act provides:

> In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a) or an action instituted under section 411(b), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for –
> (1)    any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
> (2)    any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. By denying an award of statutory damages and attorney's fees to parties that fail to promptly register their copyrights, Congress sought to encourage such copyright registration. *See Singh v. Famous Overseas, Inc.*, 680 F. Supp. 533, 536 (E.D.N.Y. 1988). Passport alleges that DIB began infringing its copyrights on February 14, 2001. Passport did not file its copyright registrations, however, until more than a year later on May 29, 2002. Thus, DIB argues, Passport is not entitled to any statutory damages under § 412. (DIB Damages Mem., at 10-11.)

Passport concedes that statutory damages are generally unavailable when infringement occurs prior to registration, but argues that "DIB engaged in new infringements after the registration of

34

[Passport's] copyrights which entitles it to maintain a right to elect statutory or actual damages on the post-registration infringements." (PSI Damages Resp., at 14.) Citing several district court cases from other jurisdictions, Passport claims that where there are differences between pre-registration and post-registration infringing activities, a plaintiff may recover statutory damages for the "new" post-registration violations. (Id.) (citing *Mason v. Montgomery Data, Inc.*, 741 F. Supp. 1282, 1285 (S.D. Tex. 1990) ("A 'new' or 'separate' basis for the award of statutory damages is created . . . where there is a difference between pre- and post-registration infringing activities."); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 609 F. Supp. 1325, 1331 (E.D. Pa. 1985).) Passport argues that DIB committed such new and distinct post-registration acts of infringement after 2002 because Karla Wygant, DIB's development manager of retail data processing, testified that DIB continued using code written by Passport even after purchasing source directly from Great Plains.

DIB notes that several courts have rejected the argument that post-registration acts of infringement satisfy § 412 even when the first alleged infringement occurred prior to registration. In *Singh*, for example, the plaintiffs, musicians and composers of Indian music, claimed that the defendant, a company that manufactured and sold in the United States cassette recordings of Indian performances, committed copyright infringement by selling 1800 of the plaintiffs' cassettes without a license. 680 F. Supp. at 534. The plaintiffs sought statutory damages under 17 U.S.C. § 504(c), but the defendant argued that such damages were not available in light of § 412 because it had manufactured and sold cassettes in 1983, before the plaintiffs applied for a copyright of their work on July 27, 1984. Id. at 535. The plaintiffs insisted that they were entitled to statutory damages for each separate infringing sale made after July 1984 because each "commenced" on the day of its perpetration as contemplated by § 412. Id.

35

In rejecting this argument, the court first looked to the legislative history of § 412, noting that "Congress' evident purpose was to induce those owning copyrightable works to register them properly." *Id.* In the court's view,

> [t]he means chosen was to deny the "extraordinary" remedies of statutory damages and attorney's fees where registration is not promptly made. The threat of such a denial would hardly provide a significant motivation to register early if the owner of the work could obtain those remedies for acts of infringement taking place after a belated registration.

*Id.* at 536. The court thus held that the manufacture and sale of the cassettes in 1983 "commenced" an "infringement" within the meaning of § 412, and since the plaintiffs did not register their copyright until July 1984, they were not entitled to statutory damages. *Id. See also Joseph J. Legat Architects, P.C. v. U.S. Dev. Corp.*, No. 84 C 8803, 1991 WL 38714, at *11 (N.D. Ill. Mar. 20, 1991) (noting that "if Congress had intended to permit recovery for acts of infringement which occurred prior to registration, then it could have used the word 'occurred,' rather than the word 'commenced'"); *Mason*, 741 F. Supp. at 1286 (plaintiffs alleging copyright infringement of their map sheets were not entitled to statutory damages where the defendants "[we]re accused of committing the same activity each time, for the same purpose, and using the same copyrighted material" both before and after the registration).

Passport urges that this case is more analogous to *Iowa State Univ. Research Foundation, Inc. v. American Broadcasting Cos.*, 475 F. Supp. 78 (S.D.N.Y. 1979), in which the defendant used the plaintiff's copyrighted film about an Olympic wrestler on three separate occasions in three different ways. First, the defendant used the material in a broadcast of a preview for the defendant's Olympic television coverage. *Id.* at 80. Second, the defendant used the material in the broadcast of a two and

36

one-half minute segment during the Olympic coverage. Finally, the defendant used the material in a "Superstars" television program. *Id.*

The court concluded that each broadcast constituted a separate act of infringement. In reaching this conclusion, the court relied on the "heterogeneity" test, which looks to differences in advertisers, financial arrangements, locales, audiences, and other "significant variables" to determine whether successive infringements are so similar that they should be treated as one continuing infringement. *Id.* at 82. The court found it significant that the broadcasts occurred at least two days and as much as nineteen months apart, and that the two broadcasts closest together in time were directed to different audiences during different parts of the day for different purposes. *Id.*

In this case, it is undisputed that DIB first infringed Passport's copyright before Passport filed a copyright registration. Even assuming that Passport is entitled to statutory damages for "new" and "distinct" acts of infringement occurring after registration, it is not clear to the court what those "new" acts are in this case. Passport alleges that DIB infringed its copyrighted software in the same manner both before and after registration. The mere fact that Karla Wygant replaced code written by Passport with code written by Great Plains does not establish that DIB was committing a different activity for a different purpose after the registration than it was committing before the registration. *Cf. Mason*, 741 F. Supp. at 1286.

Unless PSI has evidence of independent acts of infringement that post-date May 2002, it may not be entitled to any recovery on its copyright claim.

## CONCLUSION

For the reasons set forth herein, Plaintiff-Counter-Defendant Do It Best's motion for summary judgment on Defendant-Counter-Plaintiff Passport's trade secret misappropriation claim

37

(Doc. No. 182) is denied. Its motion for summary judgment on the civil conspiracy claim (Doc. No. 183) is granted without prejudice to reconsideration. DIB's motion for partial summary judgment on Passport's damages claims (Doc. No. 184) is granted in part and denied in part. Its motion for summary judgment on Passport's copyright claim (Doc. No. 185) is denied. Its motion for summary judgment on Passport's breach of contract claim (Doc. No. 186) is granted in part and denied in part. Passport's motion for partial summary judgment of liability on the copyright claim (Doc. No. 189) is denied, and its motion for leave to file adjunct pleading relating to copyrightability (Doc. No. 266) is denied as moot.

ENTER:

Dated: March 31, 2005

REBECCA R. PALLMEYER
United States District Judge