UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DO IT BEST CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 01 7674 |
| ) | |
| PASSPORT SOFTWARE, INC., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant ) | |
| ) | |
| PASSPORT SOFTWARE, INC., ) | |
| ) | |
| Counter-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DO IT BEST CORP., ) | |
| ) | |
| Counter-Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Counter-Plaintiff Passport Software, Inc. ("Passport"), claims that Plaintiff/Counter-Defendant Do It Best Corp. ("DIB") is in breach of a software licensing agreement between the parties and has committed other wrongful acts, including infringement of Passport's copyrights in the licensed software. Last year the court dismissed Passport's fraud claim but denied DIB's motion to dismiss Passport's Lanham Act claim and claim of tortious interference with contractual relations. *Do It Best Corp. v. Passport Software, Inc.* No. 01 C 7674, 2004 WL 1660814 (N.D. Ill. July 23, 2004) ("*Do It Best I*"). Several months later, the court granted DIB's motion for summary judgment on Passport's civil conspiracy claim and granted summary judgment on one aspect of Passport's breach of contract claim. The court denied DIB's motion for summary judgment on Passport's trade secret

misappropriation claims and denied both parties' motions for summary judgment on the copyright infringement claim. The court's opinion also addressed Passport's damages theories, sustaining DIB's objections to some of those theories. *See Do It Best Corp. v. Passport Software, Inc.*, No. 01 C 7674, 2005 WL 743083 (N.D. Ill. March 31, 2005) ("*Do It Best II*"). Now before the court are DIB's motion for summary judgment on Passport's claim of tortious interference with contractual relations and the parties' cross-motions for summary judgment on Passport's Lanham Act claim. In addition, Passport seeks reconsideration of the court's earlier summary judgment rulings. For the reasons set forth below, the motions are granted in part and denied in part.

## FACTS

The facts are described in some detail in the court's earlier opinion and will be summarized here only as necessary for context. In January 1989, the parties to this case entered into a licensing arrangement pursuant to which Passport furnished to DIB software that Passport itself had obtained through a license with RealWorld Corporation, and then modified and enhanced for use by DIB. (Dealer License for RealWorld Software, Passport Exhibit I.) Under the terms of its license, DIB, a hardware cooperative, was entitled to provide copies of the licensed software to DIB's member stores. As described in the court's earlier opinion, the licensing agreement between DIB and Passport expired by its terms in 1994. It was subject to renewal, and though the parties failed to take the formal steps required by the agreement for renewal, there is evidence that they continued operating under the terms of the original agreement at least until 1999.

In August 2000, Karla Wygant of DIB asked Muriel Miller of Passport to sell to DIB unlimited rights to the software. (Muriel Miller Dep., DIB Exhibit 13, at 146-47.) Passport notes that a consultant for DIB, aware that DIB used both the RealWorld original software and the

2

modifications and enhancements furnished by Passport, recommended that DIB contact Great Plains Corp.[1] and PSI at the same time, as Great Plains would "have the leverage to push Passport to sell the rights." (Grady e-mail message, 9/18/00, Passport Exhibit RR, at 2.) When DIB approached Passport, Passport (which had earlier lost another customer to Great Plains) attempted to obtain Great Plains' agreement not to interfere in any sale of the software from Passport to DIB. (Saley Dep., Passport Exhibit SSS at 23-24, 29-33.) Ellen Saley did write a letter to Muriel (Spencer) Miller of Passport, assuring her that "Great Plains hereby agrees that it's [sic] employees, agents, attorneys, directors or officers, past and present, will not interfere or intervene with your customer directly or indirectly regarding [the licensing arrangement between Passport and Do It Best]." (Undated letter, Passport Exhibit EEE.)[2] Ms. Saley prepared a draft sublicense agreement between Passport and DIB, setting the price for the RealWorld software component of the license fee at $200,000.00. (Id.; draft Sublicense Agreement, Passport Exhibit JJJ.) Muriel Miller of Passport testified that Passport's President, John Miller, planned to offer an unlimited license in the enhanced software to DIB for $4.8 million, but Ms. Miller herself mistakenly conveyed a proposed price of $1.8 figure to DIB. (M. Miller Dep., Passport Exhibit EEEE, at 166-67.) Presumably unwilling to pay such a substantial premium for the software enhancements, DIB sought Passport's assistance in

---

[1] Great Plains Software was the successor to RealWorld Corporation, the entity from which Passport originally obtained the software that Passport enhanced and provided under license to DIB. The court uses the names RealWorld and Great Plains at times interchangeably.

[2] Passport asserts that it did not reveal to Great Plains the identity of its customer until after Great Plains had "agreed not to interfere" in the deal (Passport's Response to DIB's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment Tortious Interference, ¶ 44, citing Miller Dep., Passport Exhibit AA, ¶ 23), but the letter documenting the agreement itself explicitly refers to Passport's customer as "Do It Best Corporation."

3

determining which portions of the code were products of Passport's programming; Passport asserts that, in the course of providing that assistance, Passport personnel discovered for the first time that DIB was using Passport's source code in a module it had falsely claimed to have independently authored. John Miller, Passport's president, advised DIB's general counsel on October 2, 2000, of his belief that DIB's use of Passport's code required the payment of additional royalties. (10/2/00 Miller letter, Passport Exhibit LLL.)

Four days later, on October 6, 2000, DIB officials approached Great Plains itself through a broker and, on November 30, 2000, agreed to license the RealWorld software directly from Great Plains for just $150,000.00. Passport characterizes this agreement between Great Plains and DIB as a violation of Great Plains' own agreement "not to interfere in [sic] with the sale of unlimited licensing rights to DIB." (Passport's Memorandum in Opposition to DIB's Motion for Summary Judgment on Passport's Tortious Interference Claim, at 7.) DIB asserts that neither DIB, Great Plains, nor the broker ever "concealed" their negotiations from Passport, but Passport points out that on October 2, 2000, Ellen Saley of Great Plains assured John Miller that DIB would not purchase the RealWorld original code from Great Plains because that code would be useless to DIB without the enhancements that had been furnished by Passport. (Saley e-mail message, Passport Exhibit NNN.) Passport notes, further, that on November 14, 2000, a DIB vice president wrote a message to DIB's president and its general counsel, noting that Passport had contacted her about software rights, but that she intended to delay responding until after the deal between DIB and Great Plains had been finalized. (11/14/00 Williams message, Passport Exhibit GGGG.) A week later, DIB's attorney, Thomas Burroughs, advised Gary Schafer of Great Plains that John Miller had "promised/threatened to call me first thing this morning." (11/21/00 Burroughs e-mail message,

Passport Exhibit HHHH.) In a letter to John Miller in late November, Schafer repudiated the non-interference letter, pointing out that "the commitment you received was not from me or a representative of Great Plains that is authorized to commit the company in any direction." (Undated e-mail message from Gary Schafer, Passport Exhibit OOO.)[3]

DIB contends, as well, that there is no evidence that either DIB or its broker was aware of any agreement between Great Plains and Passport that purportedly restricted Great Plains' right to negotiate directly with DIB. It is clear, however, that both DIB and Great Plains recognized that their deal might generate a lawsuit: on November 14, DIB's general counsel, Thomas Burroughs, contacted Schafer to request that the agreement between DIB and Great Plains require Great Plains to "cooperate" with DIB in any litigation brought by Passport. (11/14/00 Burroughs e-mail, Passport Exhibit IIII.) The November 30, 2000 agreement between DIB and Great Plains did require Great Plains to cooperate in good faith in any litigation that might arise between Passport and DIB related to the use of the software or to the Great Plains/DIB relationship. (Great Plains/DIB Source Code License Agreement, DIB Exhibit 2, ¶ 9(b).)

As the court explained in its earlier opinion, DIB never used the source code it purchased from Great Plains. Karla Wygant, DIB's manager of retail data processing, testified that she compared the RealWorld software with the Passport source code DIB had been using, and placed the RealWorld software in a file cabinet. DIB continued using the software furnished by Passport, with the enhancements that Passport and DIB had made to the Great Plains product. (Wygant Dep.,

---

[3] Passport contends Schafer also falsely claimed he had not begun meeting with DIB representatives until November, but no such claim appears in the materials Passport cites (Schafer's message and Karla Wygant's deposition testimony, Passport Exhibits OOO, KKK).

Passport Exhibit L, at 23-25.) Nevertheless, in February 2001, DIB advised Passport it would no longer provide a royalty report reflecting its sublicensing of software because "we are no longer buying product from you." (2/8/02 Gibson e-mail message, 2/8/02, Passport Exhibit PPP.) Passport responded with a certified letter declaring DIB in default under the 1989 license agreement, a letter that Burroughs forwarded to Schafer of Great Plains. (2/15/01 Burroughs letter, Passport Exhibit Q.) At Burroughs' request, Schafer later furnished copies of the Great Plains/Passport agreements for Burroughs' review. (3/29/01 messages, Passport Exhibits JJJJ, KKKK.)

Just six months later, in a May 14, 2001 letter, Great Plains terminated its license agreement with Passport. Schafer's letter announcing the termination cited, as reasons, Passport's failure to meet certain sales and marketing goals (goals Passport claims are not contained in the Great Plains/Passport agreement), Passport's failure to continue marketing Great Plains' products, and Passport's improper use of Great Plains' trademarks. (5/14/01 Schafer Letter, Passport Exhibit LLLL.) In an e-mail exchange the following day, Schafer advised Burroughs that the termination was "based upon poor performance and issues outside of the Do It Best Relationship." Thomas Burroughs, responded that Great Plains' termination of the Passport license might generate a "change of heart" on Passport's part concerning its disputes with DIB. (E-mail messages, Passport Exhibit MMMM.) At his deposition, Schafer testified that he did not recall discussing Passport's termination with anybody from DIB (Schafer Dep., DIB Exhibit 5, at 37-41), and that he did not show the termination letter to Mr. Burroughs before sending it. (Id. at 100.)

DIB notes that John Miller testified that the written agreements by which Passport obtained the original (unenhanced) software from RealWorld, Great Plain's predecessor, expired by their terms no later than 1991. (J. Miller Dep., DIB Exhibit 35, at 102-106.) RealWorld declined to

renew the written license agreement with Passport but, according to John Miller, RealWorld representative Robert Johnson "said that we should continue to service the dealers that we had already licensed, but that we could not license any new dealers . . . . because of a change in ownership . . . ." (*Id.* at 102.) Passport points out, however, that the July 1988 Master Value Added Distributor Agreement between Passport and RealWorld contemplated automatic renewal for additional one-year periods in return for a $100,000 annual fee. (MVAD, Passport Exhibit H, ¶ 13.1(a). In addition, in March 1998, Passport and RealWorld executed an addendum extending the term of an agreement referred to as the Master Value Added Distributor Agreement through March 2010, subject to further renewal. (Master Distributor Agreement, Passport Exhibit G, Addendum.) (The court is uncertain why this addendum to the Master Distributor Agreement refers to the Master *Value Added* Distributor Agreement; nor has Passport explained why Mr. Miller, who signed the Addendum in March 1998, apparently had no recollection of that document when he testified at his March 25, 2003 deposition. No mention is made here by either party of Passport's apparent obligation to pay $100,000.00 per year for its continued license rights.)

Until about November 2000, software provided by DIB to its member stores included a Passport copyright notice on a "splash screen."[4] At some point after entering into its agreement with Great Plains, DIB repackaged the software it had been providing to its member stores by removing PSI's name and copyright notice from the splash screen and replacing Passport's name and copyright notice with the name "CS2000," which DIB used for its computer system. (Wygant Dep., Passport

---

[4] "Splash screen is a computer term for an image that appears while a program or operating system is loading." http://en.wikipedia.org/wiki/Splash_screenAT

Exhibit M, at 82-83; Wygant Dep., Passport Exhibit L, at 46-47; Wygant Dep., Passport Exhibit U, at 199-200.) Jeffrey Wilson of DIB acknowledged that "the CS 2000, as it is used today in [DIB's] member stores, does . . . still include some or all of the software which was delivered by Passport to [DIB.]" (Wilson Dep., Passport Exhibit M, at 6-7.)

## DISCUSSION

I.   Tortious Interference Claim

In Count XII of its Third Amended Counterclaims, Passport asserts that DIB interfered with Passport's contractual relationship with Great Plains Software, Inc., the successor to the corporation from which Passport licensed software that it later enhanced and licensed to DIB. Passport alleges that DIB knew of its agreement with Great Plains and, in March 2001, induced Great Plains to terminate that agreement. (Third Amended Counterclaims, ¶¶ 39, 43.) As damages, Passport claims "the loss of the sale of the unlimited license rights to DIB, the loss of its business relationship with Great Plains" and the expense of this litigation. (Passport's Memorandum in Opposition to DIB's Motion for Summary Judgment on Passport's Tortious Interference Claim, at 14.)

The elements of tortious interference with contract are: "'(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages.'" *Voelker v. Porsche Cars North America, Inc.*, 353 F.3d 516, 527-528 (7th Cir. 2003), quoting *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 154-55, 545 N.E.2d 672, 676 (1989).

8

DIB contends it is entitled to summary judgment on this claim because Passport cannot establish the third element: that DIB induced a breach. DIB asserts that there is no evidence that DIB intentionally induced Great Plains to breach its agreement with Passport; indeed, Gary Schafer has no recollection of having discussed the matter with anyone at DIB before issuing the termination letter in May 2001. He testified unequivocally that he did not show Mr. Burroughs the letter before sending it. Nor has Passport identified any evidence that anyone at DIB was aware of the termination until after it happened. Passport makes much of the fact that DIB obtained from Great Plains a copy of the license agreement between Great Plains and Passport, but DIB has never denied being aware of the existence of that agreement. Passport urges, as well, that the termination benefitted DIB: Burroughs commented when he learned of the termination that it might generate a "change of heart" on Passport's part (presumably with respect to the price tag Passport had attached to the enhanced software). Again, however, DIB has not denied Passport's assertions that DIB stood to benefit from Great Plains' decision to terminate Passport's license. DIB argues only that there is no evidence that DIB was involved in that decision.

DIB did approach Great Plains and attempt to negotiate its own license for the RealWorld software, but DIB contends this effort was justified as fair business competition. DIB insists that Great Plains did not breach its contract with Passport when it terminated Passport's license; indeed, Passport has not identified what provisions of its license Great Plains violated.[5] To the extent that

---

[5] The Master Distributor Agreement, dated March 22, 1984, and the Master Value Added Distributor Agreement, dated July 1, 1988, both include provisions authorizing termination by RealWorld under certain circumstances. (MDA, Passport Exhibit G, ¶ 18; MVADA, Passport Exhibit H, ¶ 13.) Gary Schafer's termination letter cited, as reasons for termination, Passport's poor sales volume, inadequate number of new customers or software authorizations, and failure to register
(continued...)

9

the termination was a breach of contract, DIB argues, any resulting damages were caused by Great Plains' actions, not those of DIB.

The court agrees. Passport may be correct that Great Plains wronged it by terminating its license and that DIB wronged it by continuing to use Passport's enhancements to the RealWorld code without paying Passport. Passport's characterization of the deal between DIB and Great Plains as tortious interference, however, appears to rest on suspicion. For example, citing some e-mail correspondence between a software supervisor at Great Plains and Karla Wygant of DIB, Passport notes that Great Plains did not initially even send the "RMCobol" version of the RealWorld software to DIB, a circumstance that, according to Passport, demonstrates that neither party understood or expected that DIB would actually use the Great Plains software in its unmodified form. (11/7/00 Jermyn e-mail message, Passport Exhibit PPPP.)[6] Passport characterizes the deal between DIB and Great Plains as a "sham transaction" because both DIB and Great Plains knew that DIB could not use the Great Plains/RealWorld code without modifications. The fact that DIB could not use the unedited code does not, however, require the conclusion that DIB did not have a legitimate business interest in purchasing a license for its use. Even before contacting Great Plains, DIB had approached Passport directly, seeking to negotiate an unlimited license for the software being used by DIB's

---

[5](...continued)
software. (5/14/01 Schafer letter, DIB Exhibit 15.) The court expresses no opinion concerning the truth of Schafer's assertions or whether the alleged poor performance on Passport's part justifies termination within the language of the relevant agreements. To the court's knowledge, Passport has not sued Great Plains itself for wrongful termination.

[6]   In the court's view, nothing about this message demonstrates that the failure to send DIB a usable version of the RealWorld software was intentional, but the court assumes for purposes of this discussion that both Great Plains and DIB personnel were aware that DIB was unable to use the original RealWorld software without modifications.

10

member stores. It is undisputed that Passport could not provide such a license without the involvement of Great Plains, the owner of the original RealWorld software. DIB itself had made some contributions to the software modifications and could have intended to continue negotiating with Passport for the license to Passport's own contributions to the software. Perhaps DIB hoped Passport would reduce its $1.8 million demand for that license. Or, DIB could, as Passport has elsewhere argued, have intended to use Passport's work without paying for it. However improper such an intention may be, it does not establish that DIB had no legitimate interest in purchasing Great Plains' portion of the code. More significantly, DIB's purchase of an unlimited license from Great Plains does not constitute an interference in Passport's agreement with Great Plains.

Passport has also suggested that DIB's negotiations with Great Plains constitutes tortious interference with Great Plains' agreement "not to interfere" in DIB's agreement with Passport, expressed in Ellen Saley's undated letter. Gary Schafer advised John Miller that such an agreement was unenforceable because Ms. Saley was not authorized to make such a commitment on the part of Great Plains; nor is the court certain what consideration, if any, Passport gave for the "noninterference agreement." Notably, Passport has not sued Great Plains for breach of this contract. DIB points out that Passport did not mention the "noninterference" agreement in its Third Amended Counterclaim, and argues that Passport ought not be permitted to insert a new claim at this stage. (DIB's Reply in Support of its Motion for Summary Judgment on Passport's Tortious Interference Claim, at 3 n.1.) Assuming the agreement was binding on Great Plains, the court agrees with DIB that Passport's tortious interference claim fails because there is no evidence that DIB was aware of that agreement. *See HPI Health Care Servs.*, 131 Ill.2d at 154, 545 N.E.2d at 676 (showing of "defendant's awareness of this contractual relation" a required element of the tortious interference

claim). Indeed, the circumstances demonstrate that Passport intended that Great Plains' purported commitment not to interfere with the Passport/DIB negotiations would remain a secret from DIB.

DIB's motion for summary judgment on Passport's tortious interference claim is granted.

## II. Lanham Act

In Count XI of the Third Amended Counterclaim, Passport alleges that DIB violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by removing Passport's copyright notices from portions of the Programs and replacing them with its own such notices. (Third Amended Complaint, Count XI ¶¶ 37, 48.) In denying DIB's motion to dismiss this count, this court observed that, although the parties had not so characterized it, Passport's false designation of origin claim is fairly understood as a "reverse passing off" claim, in which a producer misrepresents the goods or services of some one else as its own. *Do It Best I*, 2004 WL 1660814 at *16-18, citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003). The Seventh Circuit has explained that "an author could file a Lanham Act claim, as opposed to a copyright infringement claim, . . . to ensure that his name is associated with a work when the work is used; this is known as a 'reverse passing off' claim." *Kennedy v. Nat'l Juvenile Detention Ass'n*, 187 F.3d 690, 96 (7th Cir. 1999), citing *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 781 (2d Cir.1994).

To prevail under the Lanham Act, Passport must prove "(1) that [DIB] used a false designation of origin . . . in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that [Passport] . . . believes [it] is likely to be damaged as a result of the misrepresentation." *Kennedy*, 187 F.3d at 695-96, citing *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990). Put more simply, Passport survives summary judgment if it shows a triable issue of fact on its claim of a protectible trademark and a likelihood of

12

confusion as to the origin of the software product DIB is distributing. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). In the court's view, the evidence that DIB removed Passport's copyright from software created by Passport meets that test. Several courts have held that removing the copyright notice from a product and falsely relabelling it can constitute unlawful "reverse passing off." *See, e.g., Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998) (defendant who removed plaintiff's name and seal from a set of architectural plans and substituted his own had "represented [the plans] to be his own work" and was thus liable for false designation of origin); *United States Media Corp. v. Edde Entertainment Inc.*, 40 U.S.P.Q.2d 1581, 1588 (S.D.N.Y. 1996) a claim of false designation of origin "may be supported . . . by further acts on the part of the infringer falsely representing itself as the owner of the work" created by plaintiff).

In the leading case, *Dastar*, the defendant released a set of videos based on a television series that plaintiffs had created years earlier. The copyright on the series had expired, however, and the Supreme Court reversed a judgment for plaintiffs on their claim of false designation of origin. To hold otherwise, the Court explained, "would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do." 539 U.S. at 37. Importantly, the Court observed that, had defendant bought some of plaintiffs' videotapes and "merely repackaged them as its own," the Court would have sustained the claim. *Id.* at 31. Passport here urges that DIB merely repackaged Passport's software as its own.

DIB insists that its own modifications to the software defeat Passport's Lanham Act claim. Specifically, DIB claims its efforts included "fixing errors in and modifying the source code, compiling the source code into object code, loading the object code onto its servers, and delivering the servers to its members." (DIB's Reply in Support of its Motion for Summary Judgment on Passport's Lanham

13

Act Claim, at 4.) Passport's contributions to the CS2000 product, according to DIB, are limited to "ideas, concepts or communications," which are not protected by the Lanham Act. *Dastar*, 539 U.S. at 34. The court concludes there are disputes of fact on this issue. Passport cites sublicense agreements between DIB and its member stores that specifically identify software modules that Passport claims it produced. (Computer Software License Agreements, Passport Exhibits BB - LL.) DIB's "build books," which document the modules and programs each member store requested, list modules that Passport claims it created separately, and DIB issues invoices to its member stores that charge the stores separately for those modules. (Build Books, Passport Exhibit CCCCC; Invoices, Passport Exhibit DDDDD.)

It is undisputed that DIB used Passport software and, to some degree, incorporated Passport's software into its own computer system. The parties dispute the degree to which the CS2000 relies on Passport's original work, as compared with DIB's contribution. As explained in *Montgomery v. Noga*, 168 F.3d 1282, 1299 n. 27 (11th Cir. 1999), "the doctrine of reverse passing off is applicable in situations where a defendant resells another person's product that has been only 'slightly modified.'" In *Montgomery*, the court upheld a jury verdict in favor of plaintiff on a "reverse passing off" claim where defendants downloaded copyrighted software and incorporated it as a utility on their CD/ROM product with plaintiff's copyright notice deleted. The court distinguished circumstances in which a defendant "substantially modified" the plaintiff's product and marketed the resulting product to a different group of customers, for different purposes. 168 F.3d at 1299 n. 27, citing *Roho, Inc. v. Marquis*, 902 F.2d 356 (5th Cir. 1990). *Montgomery*'s careful attention to the manner and method in which defendant used plaintiff's product counsels against the grant of summary judgment

14

to either party in this case, where the degree to which DIB's computer package simply reuses Passport's own programming efforts is hotly contested.

Nor is the court persuaded by DIB's contention that Passport's failure to identify how it has been injured warrants the entry of summary judgment. In *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202 (7th Cir. 1990), a reverse passing-off claim by the manufacturer of printing equipment against a competitor, the Seventh Circuit reversed a judgment in favor of defendant, noting that the elements necessary to establish a violation of § 43(a) of the Lanham Act do not include a showing of actual injury or actual confusion. Proof of actual injury would be required for an award of damages, but the likelihood of confusion is sufficient harm to establish harm to the plaintiff. Recognizing that the measure of Passport's damages for the alleged Lanham Act violation may well be identical to the measure of damages for copyright infringement, the court is nevertheless reluctant to grant summary judgment on this basis.

Both parties' motions for summary judgment on Passport's Lanham Act claim are denied.

### III. Motion to Clarify and/or Modify

Finally, Passport seeks clarification or modification of certain issues that the court addressed in *Do It Best II*. That motion is granted in part and denied in part as follows:

**A.  Joint Authorship:** In its earlier opinion, the court concluded that DIB had not met its burden of establishing the absence of disputes of fact on this issue. *Do It Best II*, 2005 WL 743083, at *6. That conclusion does not support summary judgment in favor of Passport on this issue, either. Passport's request for summary judgment on DIB's joint authorship theory is denied.

**B.  Contract Claim:** Passport has argued that the Dealer License that the parties entered into in 1984 continued in force and effect until Passport terminated it early in 2001. In its motion

15

for clarification, Passport asserts that the court erroneously found "no evidence that [Passport] attempted to collect fees or royalties on sublicenses after 1994." (Motion of Passport Software, Inc. to Clarify and/or Modify the Court Order of March 31, 2005 [hereinafter, "Motion to Clarify"], at 2.) Such a statement does not appear in *Do It Best II*. The court did comment on what it perceived as the lack of evidence that Passport had attempted to collect fees or royalties on sublicenses, but did so in the context of *denying* DIB's motion for summary judgment on Passport's contract claim for the period until January 1999. Passport now notes its statement in an earlier filing that it "has not received any license or royalty payments from DIB for sublicensing activity since October of 2000." (Motion to Clarify, at 3, citing Passport's Response in Opposition to Motion of Do It Best Corp. for Summary Judgment on Passport's Breach of Contract Claim, at 24.) That statement does not require the conclusion that Passport was receiving such payments until October 2000, but the court will assume this is what Passport meant to convey. To the extent that DIB continued making license or royalty payments, the court will simply reiterate that some business relationship continued between the parties even after January 1999, though the record is insufficient for the court to determine the precise terms of that relationship. In particular, absent further evidence on the matter, the court rejects Passport's apparent contention that all terms of the Dealer License remained in force and effect. Notably, the court's earlier opinion acknowledged the possibility that an "implied license" existed after January 1999. *Do It Best II*, 2005 WL 743083, at *5.

C. **Copyright Infringement Claim**: In *Do It Best II*, this court addressed DIB's three arguments for judgment in its favor on this issue: (a) that DIB enjoys an "irrevocable implied license," (b) that DIB is a joint author of the software, and (c) that Passport is guilty of misuse of its copyright registrations. The court expressly declined to consider an argument that it concluded DIB

16

had raised first in its reply memorandum: that the code is not copyrightable. 2005 WL 743083, at *3. Passport now asks the court to "clarif[y] . . . that DIB cannot rebut [Passport's] presumption of copyrightability." (Motion to Clarify, at 5.) The request is denied. The court did not address the argument at all, and certainly did not conclude that the presumption of copyrightability is irrebuttable in this case.

D. **Civil Conspiracy Claim**: Passport argues here that the court addressed just one of the two torts supporting its claim of civil conspiracy: copyright infringement. In today's opinion, the court dismisses the tortious interference claim, as well. Passport has suggested no other reason that the court should revisit its ruling on civil conspiracy, and the court declines at this point to entertain any further summary judgment motions.

E. **Damages**: Passport seeks reconsideration of the court's damages rulings in two respects. First, Passport argues that the court erred in concluding that Passport is entitled to recover "maintenance fees," if at all, only under a contract theory. Second, Passport asks the court to correct its statement that "[u]nless PSI has evidence of independent acts of infringement that post-date May 2002, it may not be entitled to any recovery on its copyright claim." *Do It Best II*, 2005 WL 743083 at *20. In its response to this motion, DIB acknowledges that the court's statement is properly limited to statutory damages. The court therefore grants Passport's motion and amends the sentence in question to read as follows: "Unless PSI has evidence of independent acts of infringement that post-date May 2002, it may not be entitled to any recovery *of statutory damages* on its copyright claim."

With respect to the matter of maintenance fees: having reviewed the record on this issue, the court acknowledges continued uncertainty about the nature of this element of Passport's damages

17

claim. To the extent DIB recovered license fees from its member stores for their use of software created and owned by Passport, the court acknowledges that Passport may be able to establish a claim for recovery of such fees. The court has presumed, however, without clear guidance from the parties on this issue, that "maintenance fees . . . are payments for services actually rendered by DIB and did not constitute a disguised royalty payment." Id. at 17. The court also noted the testimony of Passport President John Miller that DIB's sublicensees were not obligated to use Passport for support. Id. at 15. In its motion to modify, Passport emphasizes the testimony of Jeffrey Wilson that member stores who purchase software from DIB are in fact required to pay support and maintenance fees. (Motion to Clarify, at 10, citing Wilson Dep., Passport Exhibit M, at 66-67.) Passport notes, further, that the Dealer License required DIB to assign its rights under any sublicenses to Passport upon termination of the license. (Motion to Clarify, at 9, citing Dealer License, Passport Exhibit I, ¶ 9.516.)

In light of its continued uncertainty about the nature and function of these fees, the court will withdraw its rulings on this claim. If "support and maintenance fees" are in reality periodic license payments, Passport may be entitled to argue that some portion of those fees are appropriately attributable to the software contributions made by Passport and allegedly wrongfully retained by DIB. If "support and maintenance fees" mean fees paid by member stores for DIB's services in supporting and maintaining the software, the court would assume that the only portion of that fee recoverable by Passport would be the amount member stores paid for such fees, less the cost to DIB of providing the service. Passport's recovery might be reduced, further, to reflect that Passport contributed only a portion of the software DIB provided to its member stores and that Great Plains terminated Passport's own license in the RealWorld software in May 2001. The court notes, finally, its doubts

18

about Passport's apparent continued confidence that all terms of the Dealer License (including the termination provisions) continued in full force and effect until 2001.

## CONCLUSION

For the foregoing reasons, Do It Best Corporation's motion for summary judgment on Passport's counterclaim of tortious interference with contract (Doc. No. 210) is granted; both parties' motions for summary judgment on Passport's Lanham Act counterclaim (Doc. Nos. 261, 286) are denied; and Passport's motion for clarification or modification of this court's March 31, 2005 ruling (Doc. No. 321) is granted in part and denied in part.

ENTER:

Dated: September 12, 2005

REBECCA R. PALLMEYER
United States District Judge